FILED08 SEP '26 11:05USDC-ORP

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KIMBERLY LAREE BELL,<br>Plaintiff,<br>vs.<br>NOLAN SEBASTIAN CIAMPINI; JORDAN ALBAN CIAMPINI; TAHISHA BUCK; NAVY FEDERAL CREDIT UNION; THE UNITED STATES OF AMERICA; and THE UNITED STATES ARMED FORCES<br>Defendant. | Case No. 3:26-cv-01633<br><br>AMENDED COMPLAINT<br>(Personal Injury)<br><br>CLAIM NOT SUBJECT TO MANDATORY ARBITRATION<br><br>DEMAND FOR JURY TRIAL<br><br>Prayer: $ 36.9 million<br>ORS 21.160(1)(d) |

Plaintiff Kimberly Bell, *Pro se*, by way of Amendment as a matter of course permissible under Federal Rule of Civil Procedure 15(a) to Complaint against defendants Nolan Sebastian Ciampini; Jordan Alban Ciampini; Tahisha Buck; Navy Federal Credit Union; The United States of America, and the United States Air Force; brings this amended federal civil action for constitutional violations, civil rights violations, and tort damages arising from fifteen years of physical, sexual, emotional, and economic abuse inflicted by defendant Jordan Ciampini; electronic surveillance, workplace harassment, and privacy violations committed by defendant Nolan Ciampini and Navy Federal Credit Union ("NFCU"); and constitutional injuries caused by the United States through its agents, including denial of access to legal redress and failure to protect Plaintiff from ongoing violence, hereby alleges as follows:

1.

Due to the amount prayed for this claim is not subject to mandatory arbitration.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

## THE PARTIES

2.

Plaintiff Kimberly Bell is a 37-year-old resident of Oregon, a law student at the Willamette University College of Law (when abbreviated, "University" or "Willamette") and financial analyst employed full-time by Navy Federal Credit Union (when abbreviated, "NFCU").

3.

The United States of America is, and was at all relevant times a sovereign country existing pursuant to the Declaration of Independence governed by the United States Constitution, located in North America, sued for constitutional violations committed by federal agents who denied Plaintiff access to legal redress and failed to protect her from ongoing violence.

4. G

The United States Armed Forces is, and was at all relevant times a sovereign entity subject to suit only to the extent Congress has waived sovereign immunity. Defendant United States of America, by and through its agency the United States Armed Forces, is responsible for the acts and omissions of its officers, employees, and agents as alleged herein.

5.

Defendant Navy Federal Credit Union is, and was at all relevant times, a financial institution chartered and existing pursuant to the laws of the State of Virginia, headquartered in Vienna, Virginia, and is the Plaintiff and defendant Nolan Ciampini's employer.

6.

Defendant Jordan Alban Ciampini is, and was since August 2022, for the purpose of this complaint, a resident of Oregon, and the Plaintiff's former intimate partner and perpetrator of fifteen years of physical, sexual, emotional, and economic abuse. Mr. Ciampini can be served with process at 10900 NE 2nd Avenue, Portland, Oregon 97211. Mr. Ciampini is being sued in his individual capacity only.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

7.

Defendant Nolan Sebastian Ciampini is, and was at all relevant times, an Assistant Manager of Process Improvement & Automations at NFCU who used his position to electronically stalk Plaintiff and facilitate defendant Jordan Ciampini's abuse. Mr. Ciampini can be served with process at Navy Federal Credit Union, Building Seven, 5550 Heritage Oaks Drive, Pensacola, Florida 32526. Mr. Ciampini is being sued in his individual capacity only.

## JURISDICTION AND VENUE

8.

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367, and Title VII of the Civil Rights Act of 1964.

9.

Claims against the United States arise under *Bivens v. Six Unknown Named Agents*, the First and Fifth Amendments, and federal tort principles. Personal injury claim arising from IIED, Constitutional violations, and Title VII

10.

Venue is proper in the District of Oregon under 28 U.S.C. §1391(b) because Plaintiff resides in this district and substantial events occurred here, including Plaintiff's disability-triggering event and NFCU's employment actions.

## STATEMENT OF FACTS

11.

In April 2026, the plaintiff experienced a debilitating mental health crisis causing personal injury in the form of severe emotional distress to the plaintiff while performing her routine employment duties reporting the abuse of vulnerable individuals at Navy Federal Credit Union ("NFCU") preventing her from continuing to perform her duties as a financial analyst specializing in elder and vulnerable person financial abuse reporting. The personal injuries between 2010 and 2026 to the plaintiff were caused by fifteen years of physical, sexual, mental, emotional, and



Kimberly Bell
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

economic abuse by her intimate partner, defendant Jordan Ciampini, resulting from the agreement between defendants' Harold Eugene Ciampini, Nolan Ciampini, and Jordan Ciampini to use the Nissan Versa purchased by Harold Eugene Ciampini, to accomplish punishing the plaintiff for embarrassing caused by her refusal to date Nolan Ciampini, and made possible by Navy Federal Credit Union's internal systems and workplace culture enabling the electronic stalking, stalking, and intimidation of the plaintiff by numerous NFCU employees, and the oral contract to "find a better mother" between the local group of Nurses et. al., Tahisha Buck, and Gary Buck, with defendant Jordan Ciampini, all originating as a result of the plaintiff's lack of access to legal representation and relief for the duration of her relationship with defendant Jordan Ciampini and their subsequent contested child custody case.

12.

The personal injuries between 2010 and 2026 to the plaintiff were caused by fifteen years of physical, sexual, mental, emotional, and economic abuse by her intimate partner, defendant Jordan Ciampini, resulting from the agreement between defendants' Harold Eugene Ciampini, Nolan Ciampini, and Jordan Ciampini to use the Nissan Versa purchased by Harold Eugene Ciampini, to accomplish punishing the plaintiff for embarrassing caused by her refusal to date Nolan Ciampini, and made possible by Navy Federal Credit Union's internal systems and workplace culture enabling the electronic stalking, stalking, and intimidation of the plaintiff by numerous NFCU employees, and the oral contract to "find a better mother" between the local group of Nurses et. al., Tahisha Buck, and Gary Buck, with defendant Jordan Ciampini, all originating as a result of the plaintiff's lack of access to legal representation and relief for the duration of her relationship with defendant Jordan Ciampini and their subsequent contested child custody case.

13.

The plaintiff grew up in rural America, as homeschooled child with extremely limited access to external influences or non-religious materials ad music, with parents who were opposed



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

to her attaining a higher education, despite the plaintiff's steadfast determination to attend a university.

14.

In 2010 the plaintiff was employed with Bank of America as a teller and Sonic as a roller-skating carhop, attending college as a full-time music major and upon returning from the International Model and Talent Association (IMTA) casting call in 2010 located in Los Angeles, California, she was induced to enter a monogamous relationship with defendant Jordan Ciampini, who presented himself as an abused runaway high school drop-out who quickly began "love-bombing" the plaintiff, insisting plaintiff delay her higher education as a music major and her numerous acting, modeling, and singing opportunities in Los Angeles, California, New York City, New York, Nashville, Tennessee, and Puerto Rico, and to prove she loved him and plan to move out of town together, instead of the plaintiff moving alone.

15.

The plaintiff thought defendant Jordan Ciampini had a learning disability based on the plaintiff's history and experience with her brother's learning disabilities and on the defendant Jordan Ciampini's story of being an abused runaway who dropped out of high school and began abusing substances as a young teen, in addition to the fact that the he did not read aloud in the plaintiff's presence and did not read books he expressed an interest in reading throughout their relationship.

16.

The plaintiff was a rural homeschooled farm girl, raised with extremely restricted access to the internet and associations outside of their church.

17.

The plaintiff's mother was a high school drop-out with learning disabilities who experienced issues with untreated mental health issues and substance abuse due to experiencing significant childhood trauma from physical and sexual abuse.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

18.

The plaintiff's father joined the United States Armed Forces upon graduating from high school and was stationed in Germany with his first wife, who returned to the U.S. for a visit with family and unexpectedly divorced him without returning to Germany.

19.

In 2010, the plaintiff was planning to move far away from her family to escape domestic abuse that became unbearable for the plaintiff after her immediate family became aware she had been sexually assaulted, which thwarted their numerous efforts to arrange an unwanted marriage for the plaintiff—where her autistic brother was permitted to throw horse dung at her, nearly break her teeth with a golf ball while she was wearing braces, experiment on her with prisoner-of-war tactics like "Chinese water torture" to prevent her from resting, her mother battled substance abuse issues and forced the plaintiff to work like a hired-hand for no pay, and her father forbade her from reporting the sexual assault to law enforcement because the aggressor was in the Navy Seal training program.

20.

Between 1989 and 2007, the plaintiff and her brother were denied meaningful access to health care by the United States Armed Forces, when the plaintiff's vision condition was not discovered until she was 8 years old, she did not receive routine annual check-ups, in addition to untreated asthma until she was 16, was exposed to a vicious trained attack canine, and when numerous government physicians did not report her parents for child abuse or neglect when her autistic brother suffered from a horse stepping on his head, and other injuries, resulting in the plaintiff's brother being diagnosed with Post-Traumatic Stress Syndrome as an adult which was caused by the abuse and neglect he suffered as a minor because of cultural seclusion within the United States healthcare system by the discrimination against nationality of origin in relation to medicine within the United States healthcare system facilitated by the healthcare insurance industry's discrimination against nationality of origin in relation to medicine within the United



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

States healthcare system by refusing to cover expenses for medicinal care based upon their nationality of origin, and because of the United States and the United States Armed Forces not providing meaningful access to adequate mental health care services for citizens who have experienced trauma and those supporting them including but limited to: United States service members, veterans, and their dependents, incarcerated persons, correctional facility staff, persons experiencing housing displacement, first responders, law enforcement, medical facility staff, nurses, doctors, school teachers, parents, children, and persons who have experienced traumatic life events.

21.

Between 1989 and 2009, the plaintiff and her brother experienced extreme emotional distress from the abuse and neglect they suffered as minors, caused by the United States Armed Forces and the United States of America denying meaningful access to health care by failing to provide meaningful access to mental health services for service members of the armed forces and the families of members of the armed forces through a history and culture of stigmatization of mental health needs with service members receiving discharges from the armed forces as retaliation for seeking mental health care services which results in economic oppression of service members and their families, preventing the father of the plaintiff from actively seeking needed mental health care services after he was brought home from the middle east during the Gulf War by the Red Cross because his mother had a stroke, his paternal grandmother died, then his mother died on the day his grandmother was buried prior to him returning home from the war right in time for his mother's funeral—his second child was born few months later—resulting in his overuse of alcohol.

22.

Between 1990 and 2009, the plaintiff and her brother experienced extreme emotional distress from the abuse and neglect they suffered as minors, caused by the United States Armed Forces and the United States of America economic abuse of enlisted service members by denying



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

enlisted service members access to a living wage, preventing their parents from divorcing or separating, resulting in the plaintiff and her brother being exposed to domestic violence as minors.

23.

Between 1995 and 2004, the plaintiff and her family attended Midway Baptist Church in Gulf Breeze, Florida, where the plaintiff's father beat her brother with a leather belt in the bathroom of the church's front atrium during an evening service, resulting in her brother wailing, screaming, and having numerous bruises on his legs, back, and buttocks for a week; however, instead of reporting the child abuse as required by law the pastor, Denise Brunnet, commended the child abuse commenting "that's Brother Bell following the Lord's Word—not sparing the rod and spoiling the child" as the plaintiff and her mother ran out of the sanctuary in an attempt to intervene.

24.

Between 1997 and 2000, Pastor Denise Brunnet, Catholic converted to Baptist while in prison, who attended law school and seminary post-prison prior to becoming the pastor of Midway Baptist Church, conducted couples counseling of the plaintiff's parents and rather than reporting domestic abuse, he instructed the plaintiff's mother that the Lord did not permit her to leave the mentally and verbally abusive relationship with the plaintiff's father, resulting in the plaintiff and her brother's continued abuse and further exposure to domestic violence.

25.

The plaintiff's limited support network, limited education, and exposure to abuse as a child left her ill-equipped with a lack of adequate judgement or awareness to report sexual or domestic abuse.

26.

Sandy Morphew was the lifelong next-door neighbor of defendants Nolan Ciampini, Jordan Ciampini, and their father Harold Eugene Ciampini, and Ms. Morphew was employed as



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

the General Manager of Sonic in Milton, Florida who employed the plaintiff first in 2009, and subsequently employed defendants Nolan Ciampini and Jordan Ciampini.

27.

In 2009 upon learning of the plaintiff's naïve upbringing and that the plaintiff's boyfriend was stalking her at college and while she was working at Sonic by driving past the restaurant numerous times a day or night and sitting in the back of the Sonic parking lot and other adjacent parking lots to watch the plaintiff work, Ms. Morphew conspired with her long-time neighbor Harold Eugene Ciampini regarding the plaintiff dating his oldest son Nolan Ciampini and then Ms. Morphew employed Nolan Ciampini and continuously encouraged the plaintiff to date him, despite plaintiff's persistent objections due to his rude nature.

28.

In December 2009, the plaintiff refused numerous coercive invitations by Nolan Ciampini to attend a Ying Yang Twins concert with him and the defendant subsequently threated to confront the plaintiff's boyfriend with false accusations that the plaintiff was cheating on him with the defendant Nolan Ciampini if she refused to attend the concert with him.

29.

When plaintiff continued to refuse to date defendant Nolan Ciampini after ending the relationship with her stalker boyfriend in December 2009, Ms. Morphew employed defendant Jordan Ciampini, also son of defendant Harold Eugene Ciampini, and the younger brother of defendant Nolan Ciampini, then Ms. Morphew subsequently began encouraging the plaintiff to date defendant Jordan Ciampini.

30.

In February 2010, the plaintiff agreed to attend a movie with defendant Jordan Ciampini because she was completely unaware of the conspiracy between the Ciampini brothers, as Nolan Ciampini and Jordan Ciampini indicated they were somewhat estranged and did not seem to have a close relationship in the plaintiff's presence.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

31.

In February 2010 defendants Nolan Ciampini and Jordan Ciampini agreed defendant Jordan Ciampini would use the Nissan Versa, to transport the plaintiff on the date with defendant Jordan Ciampini to the movies and embarrass the plaintiff for wounding his ego.

32.

In February 2010, defendant Jordan Ciampini, used Nolan Ciampini's Nissan Versa to take plaintiff to the movies and to Pensacola, Florida where defendant Jordan Ciampini represented himself as a runaway living in a dilapidated house with broken windows and destroyed furniture, which he represented as his residence in Cantonment, Florida located on Chemstrand Road, and told the plaintiff about his childhood of abuse by his father, Harold Eugene Ciampini, who routinely sexually abused and beat the defendants Jordan Ciampini and Nolan Ciampini (Catholic altar boys at the local Nativity of Our Lord) with random hard objects, the extreme domestic violence by his father against his mother Karen Ciampini, and other tragically traumatizing conduct perpetuated against their family by Harold Eugene Ciampini.

33.

Soon after their first date the defendant Jordan Ciampini began love-bombing the plaintiff.

34.

During their third date in March 2010, the defendant Jordan Ciampini invited the plaintiff back to his represented residence previously mentioned in Paragraph 31. During this visit, the defendant's friend Darren Fuller gained unauthorized access to the plaintiff's cell phone and engaged in a phone call on the plaintiff's personal cell phone without the plaintiff's consent or authorization which resulted in defendant Jordan Ciampini falsely accusing the plaintiff of cheating on him, immediately after the defendant Jordan Ciampini intimidated the plaintiff by introducing her to his friends who where engaging in target practice with assault-style weapons on the property.

35.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

During this visit, the defendant's friend Darren Fuller gained unauthorized access to the plaintiff's cell phone and engaged in a phone call on the plaintiff's personal cell phone without the plaintiff's consent or authorization which resulted in defendant Jordan Ciampini falsely accusing the plaintiff of cheating on him, immediately after the defendant Jordan Ciampini intimidated the plaintiff by introducing her to his friends who where engaging in target practice with assault-style weapons on the property.

36.

During the interaction in March 2010, the defendant Jordan Ciampini introduced the plaintiff to his "little-friend"—a brass knuckle knife with an eight-inch non-retractable blade.

37.

Although the plaintiff had not previously watched the movie The Godfather, she was aware this was a reference to a weapon used for the purpose of murder.

38.

During the interaction in March 2010, previously mentioned in Paragraph 33, the defendant Jordan Ciampini the defendant established control and domination of the plaintiff through intimidation when the defendant threatened her with physical bodily injury with his brass-knuckle knife with an 8 inch non-retractable blade if she cheated on him, stating that he had access to anything he wanted through his friends and his family who were prominent community members with close ties to local law enforcement, the correctional facility, and the judiciary.

39.

Subsequently in March 2010 after the plaintiff went on several dates with defendant Jordan Ciampini, defendant Jordan Ciampini transferred his employment to the Sonic located in Cantonment, Florida, because his brother, defendant Nolan Ciampini refused to continue providing him rides to work at the Sonic located in Milton, Florida and refused to continue allowing defendant Jordan Ciampini to borrow his Nissan Versa, so defendant Jordan Ciampini asked the



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

plaintiff to provide him rides to work, which she did, and alternatively he told her that he walked to work.

40.

Between March and July 2011, plaintiff purchased a wardrobe for the defendant Jordan Ciampini after he told the plaintiff he been robbed while staying in the dilapidated house mentioned in paragraph 31 and lost his clothes.

41.

Between April and May 2010, the defendant introduced the plaintiff to his immediate family in Pensacola, Florida, and showed her the residence immediately next door where Sandy Morphew, Sonic Manager in Milton, Florida and the plaintiff's employer lived.

42.

Between April and May of 2010, the defendants' immediate family used their disabled daughter Leah Ciampini to immediately endear themselves with the plaintiff based on their knowledge the plaintiff's brother has autism spectrum disorder (ASD).

43.

Although the plaintiff was a talented musician, actress, model, and student, in May 2010 the defendant coerced her into abandoning numerous educational opportunities and offers of employment in the performance and entertainment industries, including offers in music from Sony Records, modeling in Puerto Rico, and a partial scholarship to New York Film Academy in New York City and her musical and performing arts endeavors at Northwest Florida State College because of abusive conduct by defendant Jordan Ciampini's agreement with Nolan Ciampini to exploit the plaintiff by taking unauthorized photos of her with her phone and defendant Jordan Ciampini sending them to himself, subsequently using the photos to blackmail the plaintiff, gaslight the plaintiff, and exercise control over the plaintiff's movements, communications, and decisions during the establishment of and throughout their relationship by intimidating the plaintiff through threatens to display the photos of the plaintiff online, and threats with weapons, discussing



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

gang affiliations, unfounded accusations of infidelity, monitoring plaintiff's cell phone and electronic devices, inducing other's to stalk the plaintiff, and monitoring her clothing and personal choices of associations, isolating the plaintiff from her friends and family, weaponizing knowledge of the plaintiff's prior sexual assault, and repeatedly using degrading language toward the plaintiff, including "stupid fucking bitch," "inbred," "backwoods," "dirt-worshiper," and other insults, resulting in the plaintiff experiencing severe emotional distress, panic attacks, and migraines between 2010 and 2025.

44.

Defendant Jordan Ciampini remained unemployed during the summer of 2010, telling the plaintiff that he was speaking with a military recruiter to facilitate enlisting in the service to leave town together, according to their agreed plan.

45.

In June of 2010, the defendant Jordan Ciampini took the plaintiff camping near the river with his friends.

46.

During the plaintiff's visit at the river with defendant Jordan Ciampini previously mentioned in paragraph 44, the defendant and his friends walked into the woods to smoke and left the plaintiff sitting alone reading a book by the river, because the plaintiff always refused to consume alcohol or illegal substances, this resulted in her subsequent false charge of possession of alcohol under the age of 21—despite the plaintiff's protests that the substance was not hers, she had not consumed any alcohol, the substance belonged to other parties present who were over the age of 21, and her numerous demands of the Florida Game Warden to be given sobriety tests, which she was refused by the officer stating "it doesn't work that way"—when the officer found her sitting alone with the other parties' alcohol and substances within her line of sight.

47.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In June of 2010, the plaintiff was advised that her only legal options regarding the false charge mentioned in paragraph 45 was to plead guilty, nolo contendere, or to hire defense counsel.

48.

In June of 2010 the plaintiff was further isolated from her family by the false charge mentioned in paragraph 45, accepting the defendant Jordan Ciampini's invitation to move into a house located on Charmonte Drive Pensacola, Florida with him and his friends over the summer, visit his paternal grandparents residing in Cornelia, Georgia, and plan to move out of town together.

49.

In July 2010, the defendant Jordan Ciampini coordinated with his grandfather Gene Ciampini regarding transporting the plaintiff from Pensacola, Florida to Cornelia, Georgia, with the defendant driving the entire way except through the city of Atlanta, Georgia for the plaintiff's 21st birthday where the defendant's grandfather Gene Ciampini planned and executed numerous activities for the defendant Jordan Ciampini and the plaintiff to engage with him including: dancing, swimming, a bus tour of Helena, Georgia, a visit to the cabbage patch dolls museum, among others.

50.

During the plaintiff's visit to Cornelia, Georgia with defendant Jordan Ciampini for her 21st birthday mentioned in paragraph 48, the defendant Jordan Ciampini told the plaintiff they were not permitted to engage in sexual relations while in his grandfather's home, unless his grandfather was permitted to participate, to the complete disgust of the plaintiff who elected not to have sexual relations with the defendant on her 21st birthday due to the unwanted solicitation by Gene Ciampini.

51.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

After returning from their visit to Georgia, the plaintiff routinely returned from working as a bank teller and sonic carhop to find defendant Jordan Ciampini and his friends had spent time at the beach and brought back random girls.

52.

Defendant Jordan Ciampini broke the plaintiff's dental retainer and began destroying her modeling wardrobe between July 2010 and December 2010 by routinely ripping the plaintiff's clothes off of her body—despite her instructing him to never rip or destroy her belongings—stealing her heels and clothes and giving them to other females, challenging her to go "take them back" to which the plaintiff always replied "[she] must need them more than I do."

53.

The defendant Jordan Ciampini also knocked a glass bottle up into the plaintiff's mouth, chipping her front upper tooth.

54.

The defendant Jordan Ciampini consistently engaged in extremely rough intercourse with the plaintiff, refusing her numerous request that he "not be so rough" and to "be gentle," which one time resulted in injury to his penis when he was on top of the plaintiff holding both of her legs preventing her from moving, and engaging in extremely rough intercourse which bruised the plaintiff's vagina when he lost track and slipped the wrong direction causing the plaintiff pain and suff.

55.

During the summer of 2010, the defendant Jordan Ciampini consistently failed in soliciting the plaintiff to engage in sexual encounters with many of his friends, and demanded the plaintiff wear bikinis and heels, but the plaintiff assumed the were "tests" of her loyalty, because she was accustomed to being "tested" by her mother giving her a choice between two evils, then punishing the plaintiff.

56.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 26 -5183 |
bellkimberly850@gmail.com

The defendant Jordan Ciampini also forbade the plaintiff from wearing her stilettoes, after she used them to defend herself once. Subsequently, the plaintiff's nearly 20 pairs of heels disappeared.

57.

Afterward, the plaintiff convinced her mother to permit the defendant Jordan Ciampini to utilize her Chevrolet Silverado to commute to his recently obtained job as a Kirby vacuum cleaner salesman.

58.

Defendant Jordan Ciampini groomed the plaintiff to report all of her daily movements to him through false accusations of infidelity, threats of displaying photos of the plaintiff online and threats of publicly disclosing her prior sexual assault.

59.

The defendant consistently falsely accused the plaintiff of infidelity because she was on the birth control pill.

60.

Defendant Jordan Ciampini threatened to sue the plaintiff if she became pregnant with his child and refused to carry the child.

61.

The plaintiff's mother permitted her and the defendant Jordan Ciampini to move into her run-down RV on the plaintiff's parent's farm upon finding out the plaintiff was pregnant in September 2010.

62.

The plaintiff suffered economic injury and severe emotional distress in December 2010, when, during her first miscarriage, she was arrested and convicted of the illegal possession of marijuana as a passenger during a traffic stop with defendant Jordan Ciampini, who planted the illegal substance on the plaintiff to prevent violating his probation.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

63.

As a result of this false conviction the plaintiff was required to pause her pursuit of higher education, leave her employment as a bank teller, and work numerous low-wage positions in an attempt to maintain economic stability.

64.

The plaintiff's false convictions resulted in further isolation from her family with the plaintiff and the defendant Jordan Ciampini relocating to live with the defendant's friends between April 2011 and August 2011 during the plaintiff's subsequent pregnancy with their first-born child.

65.

In 2011, when the plaintiff was pregnant with their oldest child the defendant Jordan Ciampini gradually increased his control and domination over the plaintiff by threatening her with bodily injury if he found out the plaintiff utilized her gym membership without him or his friend's girlfriend accompanying her.

66.

During this pregnancy, the defendant Jordan Ciampini controlled the plaintiff's diet by eating the food off her plate that he said she did not need and shamed her about eating her favorite snacks.

67.

Defendant Jordan Ciampini controlled the petitioner's clothing by monitoring her outfits, including undergarments prior to the plaintiff leaving their residence and upon her returning to their house almost daily.

68.

The defendant Jordan Ciampini routinely maintained control over the plaintiff by numerous of his friends stalking the plaintiff by them frequently driving past the plaintiff's residence, showing up at her residence uninvited, trespassing in her yard, and other activities.

69.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

The plaintiff worked as a waitress at a seafood restaurant during the beginning of her pregnancy until she became too ill to work for several weeks in July 2011, which caused the plaintiff to remain extremely ill each day, resulting in dietary issues, and the plaintiff vomiting numerous times daily while commuting to and while at work.

70.

Afterward the plaintiff had a difficult time securing new employment, eventually gaining employment as a waitress and bartender at a local dive bar, which financially supported the plaintiff during the pregnancy and funded the majority of purchases in preparation for the birth of her first child, that went out of business a few months after the birth of her first son.

71.

The plaintiff primarily funded the preparation for her first child, exhausting her savings, with the exception of the crib (purchased by her father) and minimal small gifts from her mother and an intimate baby shower at the dive bar.

72.

During the plaintiff's pregnancy previously mentioned in paragraph 3

64, after the plaintiff's father attempted to have the plaintiff's mother institutionalized over a financial conflict of interest; the plaintiff's childhood horse "Princess" and pig "Miss Piggy"—that the plaintiff raised from birth—were given away without plaintiff having a meaningful opportunity to relocate them or even say goodbye to her best friends; additionally, her brother relocated with and then gave away the plaintiff's childhood dog "Tippy Toes" after promising to return the plaintiff's dog to her after the birth of the plaintiff's first child.

73.

When the dive bar went out of business, the plaintiff struggled to support herself and child primarily relying on government assistance to feed herself and child because the defendant Jordan Ciampini spent the majority of his earnings on gaming platforms, sports betting, and scratch-offs.

74.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

The plaintiff was unable to obtain employment for several months, routinely applying for numerous jobs in the service industry, but was unable to obtain steady, gainful employment, until obtaining a receptionist position at a small local business.

75.

Between 2010 and 2026 the defendant Jordan Ciampini repeatedly engaged in a pattern of violent physical abuse, sexual abuse, mental abuse, and emotional abuse of the plaintiff, causing numerous injuries to her as follows, but not limited to the following conduct of the defendant Jordan Ciampini:

- destroying her personal property during violent episodes between 2010 and 2025;
- severe cranial injury in 2012 resulting in bruising and open wounds caused by defendant Jordan Ciampini repeatedly slamming the plaintiff's head into the concrete floor of their studio apartment, while surrounded by a group of the defendant Jordan Ciampini's friends, who refused to allow the plaintiff to seek medical treatment;
- repeatedly and increasingly physically and sexually abused the plaintiff by physically restraining the plaintiff, intimidating her to perform non-consensual sexual activities by the following forceful and violent conduct between 2011 and 2025, but not limited to this list:
    - holding her arms so tightly she could not escape;
    - pushing her down and lying down on top of her so she could not move, she struggled to breathe, and prevented her from obtaining her asthma medication, even while the plaintiff was experiencing panic attacks;
    - hitting and kicking her upper legs;
    - stomping on her bare toes with his steel toe boots,
    - other similar conduct causing bruises and bodily injury to the plaintiff,



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

- repeatedly threatening to deliberately withhold economic support for their children if the plaintiff separated from him to prevent the plaintiff from having the financial capacity to access legal counsel between 2011 and 2025;
- repeatedly utilized the plaintiff's unrepresented status to perpetuate the physical, mental, emotional, and economic abuse and coercion of plaintiff between 2010 and 2026;
- repeatedly requiring the plaintiff to shower with him so he could scald her with hot water between 2022 and 2025, a tactic the defendant previously told the plaintiff his father used as a form of punishment on the defendant when he was a child;
- storing of the defendant Jordan Ciampini's non-retractable 6-8 inch brass knuckle blade in the closet of the master bedroom, and occasionally in his backpack or his automobile, and threatening violence to the plaintiff with the weapon on numerous occasions between 2010 and 2026;
- requiring the plaintiff to purchase a firearm in 2022 as a condition of the defendant Jordan Ciampini moving from Florida to Oregon with the plaintiff, which the plaintiff sold to a pawn shop around August 2026 because she does not like firearms;
- repeatedly threatening the plaintiff with the firearm, and hiding the firearm from the plaintiff between 2022 and 2025;
- repeatedly restricting the plaintiff's access to the master closet where the defendant Jordan Ciampini stored his non-retractable brass knuckle blade and the plaintiff's firearm between 2022 and 2025;
- repeatedly inflicting pain on the plaintiff despite her loud and vehement protests by violently grabbing her vagina while stating "you've got to 'grab 'em by the pussy'!" because the plaintiff continued to refuse to add him to her financial accounts or purchase a family iPhone plan so he could track the plaintiff and their children;



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

76.

Between 2010 and 2025, the defendant Jordan Ciampini repeatedly engaged in a pattern of economic abuse as follows, but not limited to the following conduct:

- consistently withholding sufficient economic support from the plaintiff in a strategic manner of the defendant Jordan Ciampini capitalizing on the profits of his employment by only occasionally paying for the children's daycare or giving the plaintiff minimal cash, typically less than $500 monthly, and oftentimes subsequently requiring the plaintiff to return the funds to him at a later date, causing the plaintiff to utilize all her earnings to support their family by paying nearly all of the household and child related expenses between 2010 and 2026;
- the defendant repeatedly left gainful employment on numerous occasions to pursue economically draining ventures when the plaintiff's economic position was enhanced as a result of her dedication to improvements and hard-work at NFCU when he:
  - abandoned a stable construction position with a gutter installation company to once again work minimal self-employed construction labor positions in 2018 upon learning the plaintiff's plans to become a certified paralegal were thwarted by erroneous college advisors and she planned to instead prepare to attend law school after graduation;
  - abandoned his pile-driver position in 2020 a few months after their family gained permanent housing during the Covid Pandemic and refusing to search or apply for jobs, even when the plaintiff begged him to apply at the recently opened Popeyes (his favorite chicken place) within a mile of their residence;
  - refusing to maintain a consistent work schedule as a lumberjack, then simply refusing to return to work around the 2023 holiday season;



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

- refusing to consistently or meaningfully contribute to the household and childcare expenses after gaining employment with EVRAZ in 2024 by only occasionally paying for childcare and requiring the plaintiff to return substantial portions of the funds he did contribute to the household;

- pawning numerous of the plaintiff's personal belongings between 2010 and 2013;
- spending her grandmother's heirloom coin collection without permission between 2012 and 2015;
- wrecking the plaintiff's 2006 Yellow Nissan Sentra in 2012 resulting in a total loss;
- selling the plaintiff's 2004 Silver Chevy Cavalier to his friend Juvante McMillan without the plaintiff's consent, authorization or knowledge;
- habitually spending substantial portions of his income on alcohol, gaming, cigarettes, and gambling, while refusing to contribute meaningfully to the household expenses and childcare the plaintiff to work full-time to fund nearly all of the household expenses between 2010 and 2025;
- the plaintiff suffered from a broken tooth in 2014 because of clenching her jaws too tightly as the result of the emotional distress from the stalking and abuse by the defendant and his co-conspirators during their 6-month separation, because her employer threatened to take adverse action and retaliate against the plaintiff when she refused to respond to the numerous notes left on the plaintiff's desk by her employer's grandson, Oren Powell, (so the plaintiff started responding to the notes to prevent retaliation from her employer) and because the defendant Jordan Ciampini and Oren Powell (grandson of the plaintiff's employer at the time) were working together to sexually harass and solicit the plaintiff in person, in writing, and via electronic messages, in numerous attempts to entrap her for prostitution, while simultaneously accusing the plaintiff of infidelity because she refused to be



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

complicit with their demands, which caused the plaintiff extreme embarrassment and emotional distress;

- the plaintiff's broken tooth in 2014 resulted in numerous sinus infections requiring medication and ultimately a root-canal procedure in 2015 after she became employed with NFCU;
- between 2010 and 2025 the defendant Jordan Ciampini routinely engaged in sports betting and other forms of gambling with his earnings while refusing to contribute meaningfully to the family's expenses;
- forcing the plaintiff's mother to move out of their residence and become houseless on the plaintiff's birthday in 2019 so the defendant Jordan Ciampini could move his friend Cameron Sweatman into their home to monitory the plaintiff's movements and then train their male dog that defendant Jordan Ciampini instructed the plaintiff to purchase with her annual bonus in 2020;
- economically crippling the plaintiff immediately prior their move from Florida to Oregon for the purpose of the plaintiff attending law school, by defendant Jordan Ciampini refused to allow delivery of the plaintiff's P.O.D. moving box, one week prior to the scheduled move, after he informed the plaintiff he would assist with the delivery of the P.O.D. box while the plaintiff was on a phone call conducting an elder abuse report on behalf of NFCU, effectively preventing the plaintiff from moving without him in 2022;
- refusing to assist the plaintiff with payments for the numerous minute loans previously mentioned between 2022 and 2025;
- threatening to withhold economic support from the plaintiff and their children if the plaintiff continued to refuse to switch from an android to an iPhone and share her location with him between 2021 and 2025;



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

- threatening to withhold economic support from the plaintiff and their children if the plaintiff continued to refuse to add him to her financial accounts between 2024 and 2025;

77.

Between 2010 and 2022, defendant Jordan Ciampini routinely told the plaintiff he was playing basketball with his brother Nolan Ciampini and their friends at the local outdoor university basketball courts and refused to allow the plaintiff to join him and forbade the plaintiff to utilize the university's gym, pool, and other recreational facilities, with the defendant Jordan Ciampini telling the plaintiff that defendant Nolan Ciampini and their friends would inform him if she ever used the university's facilities.

78.

Between 2010 and 2022, defendant Nolan Ciampini assisted defendant Jordan Ciampini and the plaintiff with relocating several times.

79.

Between 2011 and 2022, the plaintiff routinely applied for numerous housing opportunities but was unable to successfully separate from the defendant Jordan Ciampini as a result of being denied access to safe affordable housing in the state of Florida when she was not approved to rent numerous apartments and houses based on income requirements of monthly income exceeding three-times the monthly rental payment and the plaintiff's income being continuously below the minimum threshold for rental approval, yet above the maximum threshold to be approved for government housing assistance, and when the plaintiff was denied numerous rental opportunities based on landlord discretion of not renting to single mothers and unmarried couples; with the only rentals for which the plaintiff could qualify solely were located in high crime areas which routinely experienced weekly burglaries and shootings.

80.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In 2013, defendant Jordan Ciampini began an affair with subordinate employee, Haley ***, which resulted in the birth of their child, Pressley, which the defendant Jordan Ciampini and his family and friends went to extreme lengths to hide from the plaintiff for over a decade; and additionally resulted in the plaintiff and defendant Jordan Ciampini separating for 6 months in 2014, prior to their second child's first birthday.

81.

During their separation and the entirety of their relationship, defendant Jordan Ciampini routinely stalked and surveilled the plaintiff and had agreements with several friends to routinely trespass at the plaintiff's residence and report the plaintiff's activities to the defendant Jordan Ciampini, for the purpose of monitoring the plaintiff's sexual activity.

82.

During their separation and the entirety of their relationship, defendant Jordan Ciampini weaponized the plaintiff's prior criminal charges, threatening to utilize his family's strong community connections.

83.

The plaintiff attempted to permanently separate from the defendant Jordan Ciampini in 2014, after being promoted from receptionist to a collection agent, but she soon found out that the owner expected her to date her grandson Oren Powell, who had been sexually harassing her at her job for months prior to the plaintiff separating from defendant Jordan Ciampini, in exchange for the promotion.

84.

During the plaintiff and defendant Jordan Ciampini's separation over the summer of 2014, the plaintiff spent many weekends on the beach lying in Savasana pose attempting to relax and process the extensive trauma she'd experienced, occasionally being joined by female friends from work.

85.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

The plaintiff and her friends would occasionally purchase drinks while relaxing on the beach during the weekends; however, the plaintiff rarely breaks her self-imposed rule of not purchasing more two drinks when drinking socially or her $25 drinking cap.

86.

On several occasions, Oren Powell and his friends invited the plaintiff and her friends to play games on the beach, including beer pong and the plaintiff participated on several occasions—but the plaintiff always refused to drink any beer during their interactions because the plaintiff does not drink beer.

87.

The plaintiff was instructed by her employer, Lavonne Agerton, through threats of retaliation, to attend a parties at their family owned condo for the holidays, and once for a summer party hosted by her grandson Oren Powell; however, the plaintiff refused to stay at the summer party for more than 30 minutes because there was only one other female present with nearly 20 males present; when the plaintiff noticed they were engaging in illegal activity utilizing illegal substances including cocaine she immediately called her mother to come pick her, and before her mother could arrive all the males attempted to force the plaintiff to board Oren Powell's boat because she refused to drink or consume any substances, pulling her out of the condo by grabbing her arm and told her she was about "get set out;" however, her mother (who was babysitting their kids) arrived and when the plaintiff told them her mom was waiting for her in the parking lot the males released the plaintiff's arm and the plaintiff went to the beach with her mother and children to calm down because she was scared they were trying to murder her.

88.

Soon after, the plaintiff was retaliated against by her employer, Lavonne Agerton, with threats of filing a false police report against the plaintiff for stealing from the company because the plaintiff's recovery rates were significantly exceeding the other employees (because the



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

plaintiff called nearly twice as many accounts daily as the average collector) and because Lavonne Agerton was angry with the plaintiff for refusing to entertain her grandson Oren Powell.

89.

Then Oren Powell, invited the plaintiff on a date to the movies, which the plaintiff agreed to go out of fear of further retaliation from her employer (because it was the only job she could get in town except as a door-to-door alarm system salesperson), after the movie and food Oren Powell sexually assaulted the plaintiff while on a date by physically holding her down and forcing her to engage in oral sex in the parking lot of their place of employment, by violently grabbing the plaintiff's arms and hair, threating to tell his grandmother if she didn't open her mouth and forcing his penis into her mouth after the plaintiff refused to engage in the sexual activity telling him she was only there because she had to be to keep her job.

90.

The plaintiff began working over-night at a second job and went back to college part-time in addition to her full-time job, attempting to gain financial stability for herself and children.

91.

In 2014, the plaintiff had to request to borrow funds from her father to prevent her NFCU credit card from charging off due to a lack of financial support from the defendant Jordan Ciampini for their two children for the six-month period he did not reside with the plaintiff during 2014.

92.

After the plaintiff permitted the defendant Jordan Ciampini to resume residing at their residence in 2014 with the condition they attend couple's therapy, because she was being sexually harassed at her place of employment, she was unable to financially support herself, two children under 3, and mother who had moved in to assist with after daycare childcare to enable the plaintiff to resume her higher education and work a second job.

93.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

However, the defendant refused to attend couple's therapy resuming his economic abuse and resuming physically abusing the plaintiff when she contradicted his continuous false accusations of infidelity.

94.

The affair between defendant Jordan Ciampini and Haley never ended, despite the defendant's consistent lies the plaintiff that she no longer worked with him and that the affair had ended, when instead, she became his kept mistress with the defendant Jordan Ciampini spending his earnings to fund her lavish rodeo queen lifestyle, resulting in the economic abuse to his family with the plaintiff and in extreme emotional distress to the plaintiff when she became aware of this during her custody dispute with defendant Jordan Ciampini due to the plaintiff losing her most loved companion in life, her horse Princess as a result of the defendant Jordan Ciampini's abuse.

95.

Between 2014 and 2020 the defendant Jordan Ciampini frequently and repeatedly began to routinely withhold affection, emotional, and financial support from the plaintiff because he was secretly supporting Haley and their child Pressley.

96.

Between 2014 and 2025, the defendant Jordan Ciampini frequently and repeatedly began to routinely break his cell phones, then demand the plaintiff allow him to assume ownership over her old phone and occasionally her phone number, requiring the plaintiff to change her phone number numerous times.

97.

Between 2014 and 2020 the defendant Jordan Ciampini frequently and repeatedly began to routinely consume alcohol daily, left their home overnights and for days at the time, for numerous reasons including, but not limited to: he did not have to communicate his plans with the plaintiff, moving in with his mistress Halely, he intended to join the UFC as a fighter, training in



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

the Boxing gym with boxers' who had registered hands—but he refused to be officially trained because he did not want to register his hands—and he became an avid UFC fan.

98.

The expungement of the plaintiff's possession conviction around 2014 permitted her to resume employment in the financial industry with NFCU, just three months after defendant Nolan Sebastian Ciampini (the brother of defendant Jordan Alban Ciampini) became employed by Navy Federal Credit Union.

99.

Although plaintiff and defendant Nolan Ciampini were hired at separate times, they both applied for employment with NFCU during the same time period, but the plaintiff's hiring date was pushed back by three months to June 2015, due to scheduling issues with the plaintiff's childcare.

100.

Between 2015 and 2026, defendant Jordan Ciampini conspired with the defendant Nolan Ciampini to electronically stalk the plaintiff by defendant Nolan Ciampini utilizing his leadership position with his employer, NFCU, and NFCU internal systems to electronically stalk the plaintiff by the defendant Nolan Ciampini electronically monitoring, via NFCU internal systems, the plaintiff's financial account activity, work schedule, work online availability, and workplace associations, contributing to the defendant Jordan Ciampini's ongoing control and intimidation of the plaintiff, who is also an employee of NFCU, causing the plaintiff extreme emotional distress as a result of being under constant surveillance by the brother defendant's Nolan Ciampini and Jordan Ciampini, culminating in the plaintiff suffering from a debilitating triggering event while reporting on elder and vulnerable person abuse.

101.

Defendant Nolan Ciampini utilized his leadership position with NFCU, NFCU internal systems, and the culture of nepotism within NFCU to monitor the plaintiff's financial accounts,



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

workplace schedule, workplace online availability, and workplace associations, in addition to utilizing his connections within NFCU and his leadership position as an assistant manager to leverage relationships with other NFCU employees, in relationships suffering from an imbalance of power, to induce them to electronically monitor the plaintiff's financial accounts, workplace schedule, workplace online availability, and workplace associations.

102.

In June 2015, Plaintiff gained employment as one of the first external Delinquency Control Counselors in the NFCU senior credit card collections department.

103.

The plaintiff was hopeful to gain economic stability through obtaining a position with NFCU to enable her to separate from her abusive partner, defendant Jordan Ciampini; however, due to NFCU culture and pattern of discriminatory hiring practices among NFCU leadership, NFCU became a cage for the plaintiff which exponentially increased defendant Jordan Ciampini's control over her every move.

104.

Plaintiff immediately discovered that numerous NFCU employees were acquaintances of her abusive partner, creating an environment where her personal life was known and monitored.

105.

In 2015, the plaintiff's first assistant supervisor at NFCU was a high school acquaintance of defendants Nolan Ciampini and Jordan Ciampini.

106.

In 2015, Plaintiff's assistant supervisor—an acquaintance of Nolan and Jordan Ciampini—attempted to embarrass Plaintiff by betting she must dance for two minutes in front of the entire department at the End-of-Month meeting to earn permission to decorate his supervisor cubicle.

107.

Shortly thereafter, the assistant supervisor relocated to another department.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

108.

Between 2015 and 2026, every department in which the plaintiff worked (collections, recovery, security, and compliance) had numerous employees who were acquainted with defendants Nolan Ciampini and/or Jordan Ciampini.

109.

Between 2015 and 2020, every time the plaintiff went to the gym or cafeteria she encountered someone who was acquainted with defendants Nolan Ciampini and/or Jordan Ciampini.

110.

Between 2015 and 2020, Plaintiff was discriminated against by a group of female employees disgruntled by NFCU's decision to hire Plaintiff and others externally rather than promoting internally by making the plaintiff "climb the collection ladder" on the basis of sex when the plaintiff engaged in a consensual sexual encounter with a co-worker who was very popular among the female employees.

111.

After the consensual encounter with the co-worker—that occurred while the defendant Jordan Ciampini had left the plaintiff for several days, telling her that he was leaving her to join the UFC and would not return—the Plaintiff's desk was moved to an isolated, cold area where she had to use blankets and gloves to keep warm.

112.

The plaintiff was instructed not to engage in relations with the co-worker with whom she had the consensual sexual encounter by numerous NFCU employees including, supervisor Krystal Beecher, Kimberly Cybart, Mandi Meyers, Kervonda Williams, and Kaitlyn Webb, who subsequently discriminated against the plaintiff because she was an external hire and did not have to "climb the collection ladder" and on the basis of sex due to the plaintiff's consensual encounter with the co-worker.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

113.

The females mentioned in paragraph 111 discriminated against the Plaintiff on the basis of sex when they informed Plaintiff she would not be promoted within the collection department because of the consensual encounter she engaged in with the co-worker.

114.

The females mentioned in paragraph 111 engaged in online chats, group chats via NFCU internal systems, and social media platforms, where they defamed the plaintiff's character and conspired to harm or engage in activity, they were substantially certain would cause harm to the plaintiff's character.

115.

Afterward, the co-worker ghosted the plaintiff and later received a promotion.

116.

Between 2015 and 2020, the plaintiff was routinely intimidated by numerous NFCU employees reminding the plaintiff they were acquainted with her abusive partner defendant Jordan Ciampini.

117.

In 2016, during an outing with females from the collection department at Ollie's Bar and Grill—a popular NFCU hangout—Plaintiff consumed one drink and her next drink was drugged after accepting a shot purchased by a female NFCU employee, and the plaintiff lost memory shortly thereafter and awoke at home the next day, her car left in the parking lot.

118.

Between 2015 and 2017, Plaintiff observed Ollie's Bar and Grill overserving alcohol to NFCU employees on numerous occasions.

119.

The establishment later changed management and changed its name.

120.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

NFCU culture requires participation in extra-curricular activities to be seriously considered for promotions, including off-site parties, bar gatherings, potlucks, gym activities, volunteer events, and fundraisers.

121.

Between 2015 and 2020, Plaintiff routinely participated in these activities to remain eligible for promotional consideration.

122.

Prior to employment with NFCU the plaintiff rarely consumed alcohol.

123.

The plaintiff had a nearly perfect attendance record and worked nearly as much overtime as available and possible in attempt to gain financial stability to be able to separate from defendant Jordan Ciampini.

124.

The plaintiff accumulated numerous awards and accolades from the NFCU collection department through her talented collection efforts and strategies, as a consistent top performing collector, and consistently made positive contributions to her team and the collection department.

125.

In 2016, assistant supervisor Kervonda Williams instructed Plaintiff to stop complimenting coworkers and to stop being cheerful in the mornings.

126.

In 2016, NFCU Assistant Manager Kaitlyn Webb denied Plaintiff two promotions to NFCU leadership despite her being qualified for the position, prior supervisory experience, perfect attendance, exceptional performance, and numerous awards, giving feedback to the Plaintiff that she was *"too meek"* and she needed to *"learn how to sell herself,"* because the plaintiff was an external hire and did not have to "climb the collection ladder" and on the basis of sex due to the plaintiff's prior consensual encounter with the popular co-worker.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

127.

Between 2016 and 2018, Kaitlyn Webb was terminated for discrimination against another NFCU employee, Larry Forney, who was also externally hired directly into the senior branch of credit card collections at the same time as the plaintiff.

128.

Subsequently, Larry Forney received a promotion to a NFCU leadership position, as an HR resolution to his discrimination complaint.

129.

In 2016, Plaintiff received a promotion to the Recovery Department as a Consumer Litigation Specialist.

130.

Between 2016 and 2019, although the Plaintiff expressed consistently that event planning was not her forte, her assistant supervisor in the recovery department demanded that she take responsibility for departmental potlucks, event planning, baby showers, birthday and holiday celebrations, harshly scolding her when others failed to clean up, causing Plaintiff to retreat to the bathroom in tears and sending the plaintiff on daily personal errands to the cafeterias, which the plaintiff willingly performed out of empathy and compassion for her assistant supervisor's health conditions.

131.

The group of females mentioned in paragraph 111 and others in the recovery department routinely complained about the events planned by the plaintiff, including but limited to: the themes of potlucks, inadequacy of baby showers and other decorations—many of which the plaintiff purchased on her own to support the team—because regardless of how often the plaintiff begged other's to take over the responsibility, they refused because they seemed to enjoy criticizing the plaintiff's identified inadequacy.

132.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Plaintiff identified distorted reporting outputs in the consumer litigation department revealing discrepancies in invoices received and payments applied to accounts; however, when the plaintiff began attempting to resolve the reporting and remittance issues the recovery department manager reprimanded the plaintiff, instructing her to only bring her concerns to him.

133.

When the plaintiff refused to cooperate with her manager's deceptive reporting methods, he instructed her to train other litigation specialists on her extra responsibilities, stripped her of the majority of her extra responsibilities, and retaliated by informing her future promotions would be blocked in the NFCU recovery department.

134.

Prior to the plaintiff's promotion to the recovery department, the then supervisor of the NFCU recovery department had prior significant experience as a part of the consumer litigation team, and she subsequently received promotions to supervisor and assistant manager of NFCU recovery department after holding a litigation specialist position.

135.

When the supervisor of the recovery department selected the plaintiff for promotion to the consumer litigation team, she informed the plaintiff that the continuation of the plaintiff's legal education was a large factor in the decision to promote the plaintiff.

136.

The plaintiff subsequently accepted a lateral transfer to a different team in the recovery department to assist a small team of three employees (including the plaintiff) and one supervisor with establishing a processes and procedures for the onboarding of third-party collection vendors, for the purpose of reporting to a different assistant manager of the recovery department.

137.

Plaintiff later discovered issues with recovery general ledgers originally assigned to the litigation team, but then reassigned to recovery third party vendor collectors, and remittance



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

processing, during the process of the plaintiff and her supervisor attempting to learn about the function of general ledgers and the remittance process through limited self-help resources on internal systems and by engaging in numerous meetings with employees responsible to balancing the general ledgers, which in retrospect contributes to her concerns regarding potential financial misconduct or money laundering by NFCU leadership, which, based on her later training and experience after transferring to the security department and after being trained and gaining skills as a financial analyst and law student, raises concerns the remittance discrepancies were potentially used to attempt to cover up general ledger discrepancies by posting inaccurate remittance amounts received for judgments on consumer accounts and possibly other accounts related to mergers between NFCU and other credit unions—which were occasionally not manually entered into the NFCU databases or repositories until payment was received.

138.

The plaintiff sent numerous emails to recovery department management team regarding the discrepancies in the General Ledgers and remittance processing, but plaintiff's attempts to access information to follow the money trail, were ignored.

139.

The plaintiff attempted to discuss the General Ledgers discrepancies with multiple NFCU recovery department leaders, resulting in a nearly complete breakdown of communication between the plaintiff and NFCU recovery department leaders who ignored the plaintiff's questions and concerns.

140.

When the plaintiff finally began to find clarity after beginning treatment by a new physician, while following her physician's orders to write through the traumatic events she experienced, to assist in processing her history of severe trauma, the plaintiff saw the big picture for the first time and based on her training and experience as a financial analyst and law student she stay up all night writing a letter to report the suspicious activity to the NFCU Board of



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Directors, Office of General Counsel, and CEO Dietrich Kuhlmann in a letter sent via FedEx on August 6th, 2026.

141.

Around August 7th, 2026 the plaintiff confirmed via the Virginia Secretary of State business entity search that the recovery manager actively operated several charitable organizations related to an overseas education fund and others, which prompted the plaintiff to report to regulatory agencies as required by her training, experience, and position as an NFCU financial analyst.

142.

The plaintiff has concerns of possible Securities Fraud being conducted and/or facilitated by NFCU leadership by false or misleading statements about compliance, risk management, and/or financial integrity, based on the plaintiff's discoveries mentioned in paragraphs 131 through 136 and the plaintiff's training and experience as a financial analyst.

143.

Between 2018 and 2020, the plaintiff's former assistant supervisor Kervonda Williams—a Recovery Department supervisor—attempted to use her leadership position to coerce Plaintiff into the unauthorized practice of law by demanding her review legal documents related to Williams' husband's business, despite Plaintiff's repeated refusals; when the supervisor left the documents on the plaintiff's desk and instructed her to review them and then advise whether she needed to hire an attorney, but the plaintiff directly advised the supervisor that she could not give legal advice and instructed the supervisor to contact an licensed attorney to determine whether she should retain legal counsel.

144.

The plaintiff accepted a promotion transfer to the NFCU security department in 2021 in an attempt to prevent further retaliation by NFCU leaders.

145.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Plaintiff did not file any reports to HR due to a historical pattern of retaliation and either relocation within NFCU or promotion-based "resolution" by the HR department and because the plaintiff as a victim of domestic violence that relied on her income from NFCU to support herself and two young children due to the economic exploitation and distress, could not assume the risk of potential retaliation by the NFCU HR department or NFCU leadership because it would have been detrimental to the client and her children, likely resulting in the plaintiff experiencing housing displacement which would likely lead to the plaintiff losing custody of her children.

146.

Between 2015 and 2025, the defendant Jordan Ciampini's abuse of the plaintiff increased because NFCU employees continuously informed him about the constant sexual advances of NFCU employees directed at the plaintiff and the defendant Jordan Ciampini threatened the plaintiff's life if she left him for an NFCU employee.

147.

In 2017, the defendant Jordan Ciampini was informed by NFCU employees that the plaintiff had withheld information from him about her annual partners-in-performance employee performance-based bonus received in 2016 and 2017.

148.

Subsequently in February 2017, the defendant Jordan Ciampini broke the plaintiff's left ankle by performing a violent wresting move on the plaintiff during her nightly yoga practice which she recently began, while she was settled into eagle position in their bedroom and was unable to avoid the defendant or react in self-defense because she was completely caught off-guard with her eyes closed and the defendant Jordan Ciampini participated in extra-curricular wrestling in school and had become stronger than the plaintiff.

149.



Kimberly Belll
1732 Toucan Street N.W., Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

The defendant threatened the plaintiff with more wrestling moves if she reported the injury and plaintiff waited two weeks after the injury to visit an urgent care center to have her ankle examined.

150.

Between 2017 and 2020, the plaintiff subsequently stopped attending gym classes regularly with her former NFCU supervisor, instead accepting regular invitations to spend her lunch breaks with Ariel Hunn—becoming nearly a daily occurrence—who discouraged the plaintiff from being friends with her former supervisor and from returning to the gym after her ankle healed.

151.

Between 2017 and 2022, Ariel Hunn befriended the plaintiff and primarily centered their friendship around food and introducing the plaintiff to wine and other drinks.

152.

Ariel Hunn was a former high school acquaintance of the defendants Nolan Ciampini and Jordan Ciampini.

153.

Between 2017 and 2025, the defendant Jordan Ciampini annually raged at the plaintiff because she refused to purchase luxury items for herself with funds from her annual bonus and only purchased minimal luxury items for the defendant Jordan Ciampini, instead primarily using a substantial portion of her bonus to payoff credit card debit and fund family experiences to create fun, healthy childhood memories for their children.

154.

Between 2017 and 2025, the defendant Jordan Ciampini consistently forced the plaintiff to fund nearly the entirety of their annual family expenses, family outings that he insisted on—helicopter riders without the plaintiff, theme parks, fairs, arcades, and other money pits—thereby preventing the plaintiff from achieving financial independence and economic stability.

155.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Between 2017 and 2025, the defendant Jordan Ciampini refused to provide adequate financial support for their household when he left a 7 year career by unexpectedly quitting his position as a general store manager for Pizza Hut in 2017 after breaking the plaintiff's ankle, then refusing to maintain gainful employment, which created economic distress for the plaintiff, forcing her to rely on her credit cards to financially support their household and subsequently use the majority of her annual bonus to pay them off annually, resulting in a financially burdensome cycle for the plaintiff negatively impacting her credit and preventing her from being able to achieve financial stability in order to separate from the defendant Jordan Ciampini.

156.

Between 2010 and 2025, the defendant Jordan Ciampini spent the majority of his waking hours at their residence engaged in wasting his earnings by actively participating in online gaming platforms, sports betting applications, and social media accounts, daily, including but not limited to: World of Warcraft, League of Legends, Call of Duty, Fanduel, TikTok, and others.

157.

Between 2011 and 2025, the defendant Jordan Ciampini refused to meaningfully contribute to the household up-keep, yard-work, or other parental responsibilities.

158.

Between 2010 and 2025, the defendant Jordan Ciampini isolated the plaintiff by continuously making derogatory, offensive, and false statements about the plaintiff in the presence of the minor children and her mother on numerous occasions, embarrassing the plaintiff.

159.

Between 2015 and 2025, the defendant Jordan Ciampini further isolated the plaintiff by reacting violently toward the plaintiff upon learning the sexual orientation of some of her friends and forbid the plaintiff from interacting with them outside of work functions—pushing, restraining, and other forms of physically abusing the plaintiff after he was informed by others the plaintiff broke his rule.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

160.

In July 2017, the defendant Jordan Ciampini permitted the plaintiff to purchase tickets and attended a country music concert in Mobile, Alabama featuring Florida-Georgia Line, with the plaintiff as her birthday gift.

161.

In July 2017, upon returning home from the concert, the defendant Jordan Ciampini was enraged because the plaintiff lift her hand up with other attendees as Nelly passed by and he touched the plaintiff's hand during the performance, resulting in the defendant Jordan Ciampini physically restraining the plaintiff by forcefully holding the plaintiff's arms to prevent her from defending herself while he called her a "f*cking slut" and *f*cking whore," then throwing her into the wall, pushing her numerous times, resulting in physical pain and suffering for more than a week from numerous bruises to the plaintiff's arms, legs, and body.

162.

Between 2018 and 2019, the plaintiff and her children utilized a black Nissan Sentra with a broken air conditioner for two summers (in Florida) due to a lack of adequate financial support from the defendant Jordan Ciampini.

163.

In 2019, the plaintiff experienced significant emotional distress when she made an anonymous call to the Escambia County Sheriff's Office located in Pensacola, Florida, from an unrecord line in a private breakroom at NFCU and reported a former co-worker and defendant Jordan Ciampini, for conspiring to harass and solicit sexual acts in exchange for money and other valuable gifts via text message, but was informed by the officer they could not help her, advising the plaintiff to "change her phone number and leave town" despite the plaintiff explaining that was economically impossible because she was the primary caretaker and financial supporter of their children with her established career at NFCU in Pensacola, Florida, to which the officer instructed



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

her to hire an attorney, seemingly exacerbating nearly all hope for legal relief or a redress of grievances for the plaintiff.

164.

After receiving no assistance from law enforcement in 2019 regarding the harassment and solicitation mentioned in paragraph 162, the plaintiff communicated with a deputy sheriff in the NFCU branch office on campus who assured the plaintiff that she was safe on the NFCU campus and that they would handle anyone who showed up on campus to harass the plaintiff.

165.

Afterward in 2019, when the harassment and solicitation continued, the plaintiff attempted to solve the issue on her own by refusing to meet the former co-worker, Oren Powell, anywhere except at the NFCU branch office on campus, where she intended to report him for harassment to the branch office deputy sheriff.

166.

Instead, the defendant Jordan Ciampini randomly called the plaintiff to confront her about the messages she had exchanged with her former co-worker, later showing her screenshots of messages that appeared to the plaintiff to have been altered; however, when the defendant refused to allow the plaintiff to explain that she was still being harassed by Oren Powell, the defendant Jordan Ciampini used the altered messages as a basis to falsely accused the plaintiff of infidelity and then forced the plaintiff to chose between the defendant Jordan Ciampini or her mother, by threatening to post screenshots of the messages and all of the pictures he had acquired of the plaintiff throughout their relationship online.

167.

Soon after in July of 2019, defendant Jordan Ciampini intentionally eroded one of the most important and dear human connections in her life resulting in the plaintiff's loss of love and affection from her mother, by the defendant Jordan Ciampini giving the plaintiff an ultimatum, requiring her to either make her divorced mother move out of the plaintiff's and defendant Jordan



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Ciampini's residence (where she lovingly assisted with caring for their children and home, and had begun working to pay rent as required by the defendant Jordan Ciampini) prohibiting her mother from returning to visit the plaintiff and their children, or else he would leave and refuse to provide economic support for their two children.

168.

This caused the plaintiff to feel as though she had no option but to require her mother to move out resulting in an emotional argument between the plaintiff and her mother moving out on the plaintiff's birthday in 2019.

169.

Afterward, the plaintiff became concerned that the defendant Jordan Ciampini was conspiring with her prior co-worker and sexual abuser Oren Powell, when she remembered that defendant Jordan Ciampini forced her to give him her phone permanently and required the plaintiff to purchase a new phone after their reconciliation in 2014.

170.

Subsequently, the plaintiff's mother was houseless at various times between 2019 and 2025, rarely speaking to or returning the plaintiff's phone calls, messages, or letters. Plaintiff has suffered and will continue to suffer severe emotional distress and life-long agony because of the damage to her and her children's relationship with their grandma by the defendant Jordan Ciampini effectively causing the plaintiff a loss of love and affection from her mother, and preventing the plaintiff from reconciling with her mother prior to the death of the plaintiff's mother in April 2026.

171.

Subsequently in July and August of 2019, the plaintiff assisted her mother in renting an apartment and obtaining an interview and position as a janitor with the vendor responsible for NFCU cleaning services, where she worked in the building connected to the building where the defendant Nolan Ciampini worked.

172.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Between 2019 and 2022, the defendant Jordan Ciampini routinely refused to permit the plaintiff and their children from visiting the beach with the plaintiff's mother, and refused to permit the plaintiff's mother to visit their residence, resulting in the plaintiff trying to secretly meet her mother at the local parks and her mother's apartment to maintain their strained relationship, but defendant Jordan Ciampini always found out about these secret visits and would subsequently physical abuse the plaintiff by kicking, hitting, restraining, pulling out the plaintiff's hair, pushing plaintiff into walls, and falsely accusing the plaintiff of infidelity.

173.

Between 2015 and 2025, the defendant Jordan Ciampini routinely demanded the plaintiff help him obtain employment with NFCU; however, each time the plaintiff would remind him that his criminal records must be sealed first, the defendant accused the plaintiff of infidelity, called her derogatory names, and raged at the plaintiff for refusing to get him a job.

174.

In 2019, the defendant Jordan Ciampini contracted the Herpes virus and exposed the plaintiff and their two minor children to the virus.

175.

Between 2019 and 2025, the defendant Jordan Ciampini contracted and exposed the plaintiff and their minor children to lice on several occasions.

176.

Between 2010 and 2025, the defendant Jordan Ciampini required plaintiff to utilize a religious medical center, which prohibits the administration of birth-control on the premises because the facility is a religious based organization, causing in the birth of the plaintiff's second and third children in addition to numerous unwanted pregnancies after the plaintiff's attending physician Doctor William Lile refused to consult with the plaintiff about permanent contraception after the birth of her second child because she was "under 28 years of age and did not yet have three children," so in 2014—while separated from defendant Jordan Ciampini—the plaintiff



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

elected to use the Nexplanon implant in her arm because she was fearful of an internal injury from an IUD due to a history of violent sexual abuse by defendant Jordan Ciampini molesting her with various objects despite her objections and demands to stop because he was causing her severe pain.

177.

In 2014, the plaintiff's physician William Lile, conducted the procedure to place the Nexplanon implant in the plaintiff's upper left arm in an off-premises location, utilizing a storage room in the back of another physician's office.

178.

Between 2014 and 2017, because the defendant Jordan Ciampini is religiously adverse to birth control and family planning services, after learning the plaintiff had the birth control implant in her arm when he restrained the victim by violently grabbing and squeezing her upper left arm, the defendant thereafter routinely grabbed the plaintiff's upper left arm forcefully to punish the victim for utilizing birth control and in attempts to break the implanted birth control device causing the plaintiff to experience bruising and swelling resulting in severe pain and suffering to the plaintiff on each occasion and for days afterward.

179.

Around 2017, the plaintiff's attending physician William Lile, experienced complications when removing the Nexplanon implant in an off-premises location, utilizing a storage room in the back of another physician's office, being nearly unable to finish conducting the procedure without surgical equipment due to abnormally excessive scar tissue buildup and the implant being broken, causing the plaintiff to be fearful for her medical safety—while having a procedure conducted in a storage room—and causing her severe pain and suffering for weeks after the removal.

180.

Between 2017 and 2020, the plaintiff was required to self-administer Depo-Provera shots for contraception due to the religious healthcare facility policies against the administration of contraception on the premises.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

181.

The plaintiff began experiencing difficulties with the contraception injections not absorbing properly into her muscle tissue after the defendant Jordan Ciampini required the plaintiff's mother to move out of their residence and he subsequently moved his friend Cameron Sweatman into their home in 2019, until the plaintiff refused to move the belongings of Cameron Sweatman in 2020 into a new residence after the plaintiff and defendant experienced housing displacement issues during the Covid pandemic of 2020.

182.

In late summer of 2020 when defendant Jordan Ciampini quit his employment as a bridge-building pile-driver, he told the plaintiff that he would be a attending crane operator program to obtain his crane operator license, and that he used funds from his retirement account to fund payment for the crane licensure program; however, several months later defendant Jordan Ciampini informed the plaintiff the crane program in Florida closed due to a storm, that the closest location was in Texas, he was unable to receive a refund of the thousands of dollars he had paid up-front, then defendant Jordan Ciampini refused to inquire about the crane program in Texas or gain new employment, became a vocal supporter of the Trump Administration primarily based upon his consumption of copious amounts of programing idolizing President Donald Trump and the numerous methods used by President Trump to promote the incitement of violence against women such as his Access Hollywood quote "grab 'em by the pussy," and numerous similar gender bias degrading comments, which emboldened the defendant Jordan Ciampini to prey on the plaintiff as a marginalized victim of domestic violence unable to access legal civil recourse or a redress of her grievances due to economic abuse of the plaintiff by defendant Jordan Ciampini which exponentially increased the frequency and amount of physical and sexual abuse he inflicted on the plaintiff between 2020 and 2025, resulting in more severe bruises and more painful injuries to the plaintiff nearly weekly rather than occasionally (as was previously consistent with the defendant's historical pattern of abuse).



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

183.

Subsequently, between 2020 and 2022 the defendant began strictly controlling all of the activity at the residence he shared with the plaintiff, rarely permitting the plaintiff to have visitors or spend time away from the home, by becoming increasingly controlling and violent toward the plaintiff during sexual encounters, often resulting in bruises and bodily injury, which were typically the result of his non-sober rages.

184.

Between 2020 and 2023, after the defendant Jordan Ciampini refused to seek employment after unexpectedly separating from his employer in 2020, he increased the isolation of the Plaintiff by refusing to allow the Plaintiff to maintain meaningful relationships with her few supportive family members and friends, by forbidding her from communicating with them, regularly refusing to allow visitors to stop by or enter their residence, and him rarely leaving the residence except to purchase alcohol or fast food—during which time his father, Harold Eugene Ciampini's bee keeping business exponentially increased sales orders during the height of the pandemic, offering numerous flavors of infused honey stick samples at the downtown Saturday market—with the defendant Jordan Ciampini spending the majority of his time either closed in their bedroom with his computer and cell phone or sitting on the front porch with his phone or his cell phone, and rarely contributing to household expenses, with the Plaintiff continuing to work full-time and attend college part-time while being the primary caretaker of their children, in addition to assisting in funding his online streaming sports casting venture, Sporting Advantage, and others unknown to the plaintiff.

185.

Between 2021 and 2022, the plaintiff's next-door neighbors began routinely checking in on the plaintiff during and after the plaintiff's high-risk pregnancy with their youngest child.

186.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In January 2021, the plaintiff's paternal grandfather died and the defendant Jordan Ciampini capitalized on the plaintiff's vulnerable state of emotional distress by constantly reminding the plaintiff of her history of sexual assault, causing the plaintiff to suffer from panic attacks on a routine basis (nearly daily).

187.

During 2021, the plaintiff experienced a high-risk pregnancy which resulted in a difficult birth of their third child during which time the defendant Jordan Ciampini neglected the plaintiff's dietary and other needs, refused to work or contribute financially to their household expenses, forcing the plaintiff to work full-time to support him and their children.

188.

During 2021, when the plaintiff learned she was pregnant while at a consultation regarding permanent contraception, the plaintiff informed her physician, Doctor Lile with Sacred Heart Medical Group, her pregnancy was unwanted and unplanned as a result of the defendant Jordan Ciampini's recent abuse.

189.

Due to the economic abuse and physical abuse, in addition to the plaintiff growing continuously weaker during her high risk pregnancy, and defendant Jordan Ciampini refusing to move out, the plaintiff resigned their lease in 2021.

190.

The plaintiff had a nearly perfect attendance record and consistently was on either the Dean's list or the President's list nearly each semester at all the higher education institutions she attended prior to beginning law school, despite her challenging situation because she understood that higher education is a luxury in the United States and the socially accepted economic restrictions placed on higher education in the United States are a violation of the right to life and of international human-rights obligations, because they violate of Article 3 of the *Universal*



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

*Declaration of Human Rights* and Article 6 of the *ICCPR*, which recognize the inherent right to life and require states to protect it and prevent arbitrary deprivation.

191.

In 2021, during the plaintiff's high-risk pregnancy, she studied for and passed the LSAT entrance exam.

192.

Between 2021 and 2022, after the birth of their third child, the defendant Jordan Ciampini rarely cared for their new baby, routinely leaving the baby in the care of the plaintiff while she was working remotely and he only cared for their baby while the plaintiff attended college classes and so the plaintiff could take occasional breaks for a few minutes at the time; and when he did assume care of the baby he routinely only either paced around the house while holding the child or left the baby in the care of their older elementary aged children, resulting in the continuing weakening condition of the plaintiff.

193.

Between 2021 and 2022, after the birth of their third child, the defendant Jordan Ciampini refused to attend parenting classes as requested by the plaintiff and he refused to stop drinking daily.

194.

Instead, after the plaintiff stopped breast feeding, the defendant Jordan Ciampini began demanding the plaintiff drink with him nearly daily despite the plaintiff's numerous rejections, and when the plaintiff refused to drink he would become irate, falsely accuse the plaintiff of infidelity, insisting she drink and by this time in her life after years of abuse and a high risk pregnancy the plaintiff did not have the strength to fight and argue with the defendant so oftentimes, she unwillingly conceded to his wishes.

195.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In December 2021, the plaintiff was accepted by a law school in Oregon and received a partial scholarship to attend.

196.

In December 2021, when the plaintiff told defendant Jordan Ciampini the exciting news that she was accepted and would be attending law school in Oregon beginning the Fall of 2022, he became irate and refused to discuss the move or the plaintiff's plans to attend law school and move.

197.

Instead, the defendant Jordan Ciampini withdrew from the plaintiff, refusing to communicate about daily matters, refusing to look at rentals online with the plaintiff, or discuss moving with the plaintiff.

198.

The defendant Jordan Ciampini began forcing the plaintiff to watch gruesome horror TV show *Dexter*—featuring a psychopath serial killer's various methods of dismembering the bodies of his victims.

199.

Between 2021 and 2025, the plaintiff began to realize that the defendant Jordan Ciampini did not have difficulty reading aloud as she expected when he began to occasionally read the Bible aloud to their children.

200.

Between December 2021 and July 2022, the defendant Jordan Ciampini began increasingly inviting his friends, to their residence requiring the plaintiff cook for them and attempting to force the plaintiff to engage in sexual activities with his friends and encouraged his friends to solicit the plaintiff, requiring the plaintiff to threaten reporting them for trespassing (because in Florida, they are more concerned with protecting property than people).

201.



Kimberly Bell
1732 Toucan Street N.W., Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Between December 2021 and July 2022, the defendant Jordan Ciampini began increasingly inviting one of his friends who routinely spent significant amounts of time in Washington state, intimidating the plaintiff by telling her that she would always be watched.

202.

In early 2022, the plaintiff secretly obtained abortion services to discontinue an unwanted pregnancy which resulted from increased sexual abuse by the defendant Jordan Ciampini.

203.

In May 2022, the plaintiff again secretly attempted to obtain abortion services, but she was informed in June 2022 that her appointment had been canceled due to a change in state law which effectively limited abortion services, which resulted in the plaintiff being unable to obtain abortion services until August 2022 after relocating to Oregon, during which time the plaintiff experienced intermittent bleeding, contractions, and abdominal pain while packing and moving from Florida to Oregon during June 2022 and July 2022.

204.

In July 2022, the defendant Jordan Ciampini refused to allow delivery of the plaintiff's moving P.O.D. container intended for the plaintiff's move from Florida to Oregon for the purpose of plaintiff attending law school while the plaintiff was on a phone call working remotely and after telling the Plaintiff he would open their gate to allow the delivery.

205.

In July 2022, the defendant Jordan Ciampini demanded the plaintiff take out multiple "minute-loans" to fund purchasing him a steel flatbed trailer and then forced the plaintiff to pack and load all her and their household belongings onto his trailer.

206.

In July 2022, the defendant refused to have his truck serviced prior to the cross-country move and as normal, refused to allow the plaintiff to drive his truck.

207.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In July 2022, the defendant Jordan Ciampini refused to assist the plaintiff with properly securing their household belongings on his trailer, subsequently causing the plaintiff to spend the first three nights of their trip in the adjacent town of Mobile, Alabama, less than an hour away from their home, causing the trip to be delayed resulting in severe mental and emotional distress to the plaintiff and serious financial distress through unkept hotel accommodations with non-refundable reservation fees.

208.

The journey from Florida to Oregon was extremely challenging, with multiple variables negatively impacting the progress of their journey, including, but not limited to: transmission issues with the defendant Jordan Ciampini's truck requiring fluid change, a flat tire on his truck, inadequate securing of their belongs on the trailer requiring numerous daily stops to resecure and patch to reduce damage, the defendant Jordan Ciampini contracting an illness, and repeated numerous daily stops to prevent his truck's engine from overheating and exploding, causing the plaintiff extreme emotional distress due to being terrified of breaking down on the trip and not having enough funding to complete the journey to Oregon.

209.

During the journey from Florida to Oregon the defendant stopped complaining of his truck having mechanical issues after the plaintiff told him that if the truck broke down it would be okay because she would take the kids and the dog to go get help for him.

210.

The plaintiff experienced severe emotional distress and severe physical pain and suffering because of having to obtain access to numerous abortions between 2022 and 2025 as a result of the defendant Jordan Ciampini's unrelenting sexual and physical abuse, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

211.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

When the plaintiff moved from Florida to Oregon in July 2022 for the purpose of attending law school, the plaintiff was around five months pregnant, as a result of the defendant engaging in a pattern of consistent and repeated sexual abuse of the plaintiff, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

212.

Within two weeks of moving to Salem, Oregon, the plaintiff secretly obtained an abortion in Portland, Oregon, because she was fearful for her safety based on prior threats by defendant Jordan Ciampini to pursue legal action against the plaintiff if she obtained an abortion without his express permission, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

213.

The plaintiff had to obtain access to numerous additional abortion services online between 2022 and 2025 as a result of defendant Jordan Ciampini's continued sexual and physical abuse, forcing the plaintiff to engage in non-consensual sexual activity by uses of physical force, threats of violence, gaslighting, mental abuse, emotion abuse, and economic abuse, causing extreme emotional distress to the plaintiff, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

214.

When the defendant Jordan Ciampini discovered, from NFCU employees who utilized NFCU internal systems to access the plaintiff's NFCU bank accounts without a legitimate business purpose, that the plaintiff obtained abortion services in Salem, Oregon between 2023 and 2024, the defendant Jordan Ciampini beat the plaintiff, stomped on her bare toes with his steel toe boots, pushed her into the wall numerous times, and violently physically restrained the plaintiff without her consent while engaging in violent and painful intercourse with the plaintiff despite her begging the defendant Jordan Ciampini to release her and stop being violent with her resulting in severe emotional distress and extreme physical pain and suffering from numerous bruises to the plaintiff's



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

arms, hands, and legs, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years..

215.

After arriving in Oregon, the defendant Jordan Ciampini told the plaintiff that he could not work because his truck unreliable transportation and he refused to permit the plaintiff to have the truck inspected by a mechanic for months and he refused to obtain employment.

216.

After arriving in Oregon until the plaintiff accepted employment as a logger, instead of caring for their new baby daily, the defendant Jordan Ciampini routinely left the baby in the care of the plaintiff while she was working remotely and he only cared for their baby while the plaintiff attended classes and during occasional momentary breaks, refusing to allow the plaintiff to take a break from childcare except for some routine shopping trips, and an occasional shower, resulting in the plaintiff experiencing extreme emotional distress for years.

217.

Between 2022 and 2025, after relocating to Oregon, the defendant Jordan Ciampini began routinely bringing home various rocks to the plaintiff to remind the plaintiff of her rock-collecting mother, causing the plaintiff extreme emotional distress each time he returned with rocks resulting the plaintiff spending numerous days barely able to contain her tears and sorrow, resulting in the plaintiff experiencing extreme emotional distress for years.

218.

In 2023, while defendant Jordan Ciampini was employed by a logging company, the plaintiff found large heavy rocks in his backpack while routinely packing and unpacking his daily lunches, and when the plaintiff laughed because the defendant told her it was a prank by the other loggers, the defendant became extremely violent—stomping on the plaintiff's toes with his steel toe boots, pushing her into the walls, restraining her arms with his hands while threatening bodily injury to the plaintiff for laughing at the prank, and again physically restraining her, despite her



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

demands to Stop, with his hands while forcefully engaging in violent sexual activity causing pain and injury to the plaintiff that lasted nearly a week, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

219.

While working as a logger, the defendant Jordan Ciampini became significantly stronger, while the plaintiff was weaker due to her recent high-risk pregnancy and subsequent excess loss of blood from the numerous pregnancies by the defendant Jordan Ciampini necessitating induced abortions, which reduced the plaintiff's ability to defend herself or evade the defendant's abusive conduct as well as she could previously, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

220.

In 2023, after the plaintiff lost her "baby weight" from her third childbirth, the defendant Jordan Ciampini's abuse of the plaintiff continued to escalate and a local nurse and PhD student, Tahisha Buck entered into an oral contract with defendant Jordan Ciampini when she (1) offered to "find him a new better mother for his children," (2) when Gary Buck, her father, conducted a transfer of real property to the defendant Jordan Ciampini, and (3) when the defendants Jordan Ciampini and Tahisha Buck demonstrated they accepted the offer through moving in together, planning a marriage, and giving birth to their daughter C. C. in spring of 2026 resulting in the plaintiff experiencing extreme emotional distress for years.

221.

Between 2023 and 2025, the defendant Jordan Ciampini routinely mentioned the previously the agreement in paragraph 219 with Tahisha Buck to the plaintiff, through his hostile daily vulgarities directed at the plaintiff reminding her that he was looking for his new "better mother for his children" because the plaintiff did not "dress like a mother," cook three "homemade meals" each day, and she refused to have cosmetic improvements (glute implants, breast implants, tummy tuck, botox injections, and hair extensions) that defendant Jordan Ciampini told her she



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

needed, while she worked full-time as a financial analyst, attended law school part-time, managed the household, and numerous extra-curricular activities for their three children resulting in the plaintiff experiencing extreme emotional distress for years.

222.

Between 2023 and 2025, the defendant began routinely clenching the plaintiff's loose belly skin with his bare hands while pulling it up tightly stretching the plaintiff's skin as tight as possible while the plaintiff begged him to stop and never stretch her skin out in that manner because it was extremely painful, feeling like she was being skinned alive, but the defendant refused to discontinue torturing the plaintiff instead instructing her "shut-up, that doesn't hurt" every time resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

223.

Between 2023 and 2025, the defendant routinely and consistently engaged in extremely rough and violent intercourse and sexual activity with the plaintiff, told her "I'm going to your your pink pussy and no one will ever want to touch you after I'm finished," and refused to stop engaging in activity that caused severe pain to the plaintiff's vagina, resulting in the plaintiff experiencing damage to her vaginal tissue resulting in discoloration and extreme physical pain and suffering for months due to the repeated abuse, in addition to extreme emotional distress and an extreme sexual trauma which will likely take years for the plaintiff to fully recover from experiencing, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

224.

Between 2023 and 2025, the plaintiff began experiencing frequent panic attacks, migraines, high blood pressure, and depression as a result of the oral contract between defendants Jordan Ciampini and Tahisha Buck as a result of the plaintiff's loss of consortium with the defendant Jordan Ciampini because of the oral contract, because the defendant Jordan Ciampini began to



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

exponentially escalate his abusive attacks on the plaintiff based on the advice of other defendants, resulting in the plaintiff experiencing extreme emotional distress for years.

225.

Between 2022 and 2025, the defendant Jordan Ciampini habitually raged and screamed in the plaintiff's face, calling her derogatory names, repeatedly screaming in the plaintiff's face "nobody wants to hear what you have to say" and that she was "not a mother" nearly each time their youngest child would cry or seek out attention from his father, the defendant Jordan Ciampini, resulting in the plaintiff experiencing triggered flash-backs of the domestic abuse each time she hears a child cry or scream, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

226.

In July 2024, the defendant belittled the plaintiff and called her derogatory names at a soccer tournament for their oldest child, in the presence of parents of their child's teammates the plaintiff causing extreme embarrassment for the plaintiff and resulting in her experiencing a panic attack which resulted in her having a difficult time locating a bandage in her bag for their youngest child, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

227.

Later in the evening of the same day in July 2024 mentioned in paragraph 225, the defendant violently assaulted, raped, and strangled the plaintiff, beginning by raging and screaming in the plaintiff's face about the incident at the soccer tournament, resulting the plaintiff experiencing a panic attack and going to their bedroom closet to calm down; but the defendant followed her upstairs, violently dragged her from the closet by her waist while she was holding onto the closet rack to prevent him from pulling her out, he picked her up by the waist, threw her onto their mattress (which was on the floor), lunged onto the mattress on top of her holding her legs down with his knees, restraining her arms with one hand while she screamed continuously for



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

him to "stop" and used his other hand to pull her pants down around her legs to help him restrain her, and he violently penetrated her vagina and anus with his erect penis while she was struggling unsuccessfully to get free, but when the plaintiff bit his chest freeing one of her hands, the defendant placed one hand over her mouth and when she attempted to bite his hand he placed his hand around her throat strangling the plaintiff for around a minute before their oldest and youngest children barged into the room to check on the plaintiff, resulting in the defendant Jordan Ciampini releasing the plaintiff prior to the defendant ejaculating (the plaintiff derived no pleasure—only immense pain and suffering from this event), resulting in the plaintiff experiencing CPTSD, flash-backs, anxiety, depression, nightmares, and insomnia, in addition to resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

228.

In July 2024, the defendant Jordan Ciampini showed the marks from the plaintiff's attempted self-defense during his assault, rape, and strangulation of the plaintiff to their children and the defendant Jordan Ciampini told their children that the plaintiff was abusing him, resulting in the plaintiff experiencing extreme emotional distress for years.

229.

After the plaintiff was assaulted, raped, and strangled by the defendant Jordan Ciampini in July 2024, she subsequently sought legal assistance again from several local resources, including the Center for Hope and Safety and Oregon Legal Aid Offices, but was unable to obtain assistance with legal representation regarding the custody of their children, resulting in the plaintiff experiencing extreme emotional distress for years.

230.

As a part-time law student, full-time remote financial analyst, and mother of three children and a dog, the plaintiff sought limited advice from trusted mentors who advised the plaintiff to compartmentalize the issues to succeed—affirming the plaintiff's conception she was unable to abandon the residence shared with defendant Jordan Ciampini in order to maintain her employment



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

and continue her higher education, due to student loans and other social and economic factors resulting in further exposure to continuously increasing abuse by the defendant Jordan Ciampini between 2024 and 2025, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

231.

Between 2024 and 2025, defendant Jordan Ciampini began utilizing family resources and his accrued vacation time to make improvements to real property owned by Tahisha Buck in Portland, Oregon and to real property owned by Gary Buck in Cave Junction, Oregon, resulting in the plaintiff experiencing economic loss, severe pain and suffering and extreme emotional distress for years.

232.

Between July 2024 and December 2024, the plaintiff communicated with her immediate NFCU supervisor in the security department about the escalation of domestic abuse issues which she was experiencing with defendant Jordan Ciampini.

233.

Between 2022 and 2025, the defendant Jordan Ciampini demanded the plaintiff return funds to him monthly because he was unable to pay for gas to drive to his job.

234.

Between 2022 and 2025, the defendant Jordan Ciampini demanded the plaintiff drink with him daily so she "would be loose enough" for him, and when the plaintiff refused the defendant Jordan Ciampini would accused her of infidelity, unleash a violent rage of expletives, debasing name-calling of the plaintiff, stepping on her bare toes with his steel-toe boots, pushing the plaintiff, and treating her like his personal rag-doll, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

235.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In June 2024, the defendant Jordan Ciampini began to routinely physically and sexually abuse the plaintiff on a weekly basis, causing the plaintiff extreme pain and suffering from the numerous bruises resulting from the defendant Jordan Ciampini physically restraining her while sexually abusing her despite her protests and demands that he Stop, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

236.

Between 2022 and 2025, the sexual abuse by the defendant Jordan Ciampini caused the plaintiff to endure numerous abortions resulting in health complications for the plaintiff, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

237.

Between 2022 and 2025, the domestic abuse by the defendant Jordan Ciampini caused the plaintiff health issues, including vitamin deficiencies, rapid weight loss resulting in significant hair loss—with it falling out by the fistfuls—resulting in the plaintiff having to cut her hair short despite preferring to keep her hair long, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

238.

In 2010, prior to becoming the prey of defendants Nolan Ciampini and Jordan Ciampini, the plaintiff had a consistent credit score rating of higher than 750, resulting in the plaintiff experiencing economic loss and extreme emotional distress for years.

239.

Between 2010 and 2025, the domestic and economic abuse by the defendant Jordan Ciampini had a significant negative impact on the plaintiff's credit history, resulting in higher interest rates on loans, restricted access to available credit, derogatory marks on the plaintiff's credit history, and other associated negative impacts, resulting in the plaintiff experiencing economic loss and extreme emotional distress for years.

240.



Kimberly Bell
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Between 2010 and 2025, defendant Jordan Ciampini routinely hacked and monitored the plaintiff's email accounts and cell phones or caused another person to routinely hack and monitor the plaintiff's email accounts and cell phones, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

241.

In June 2024, the defendant Jordan Ciampini became infuriated with the Plaintiff, screaming at petitioner for numerous hours, verbally degrading and embarrassing her calling her "stupid f*cking b*tch" and assaulting the petitioner through the use of unwanted force for the purpose of gaining sexual pleasure, resulting in numerous bruise to plaintiff's arms, legs, and body, severe emotional distress and extreme pain and suffering, by forcefully and violently restraining her with his bare hands squeezing her arms as tightly as possible, shaking her, and pushing her into walls, after she shared that she was considering serving as a Public Defender rather than a "big-shot" attorney, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

242.

In July 2024, five years after the plaintiff received an email from her mother thanking the plaintiff for helping secure an interview for a position as a janitor working at NFCU, the defendant Jordan Ciampini assaulted, raped, and strangled the plaintiff while she was having a panic attack by dragging her out of their closet, throwing her on their bed, physically restraining her, ripping her clothes off, violently raping her, then strangling her for trying to get away and defend herself. The defendant Jordan Ciampini did not stop strangling the plaintiff until their sons burst into their bedroom to check on the plaintiff, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

243.

The very next day the defendant Jordan Ciampini demanded the Plaintiff take the family out for lunch and a shopping spree at Bass Pro Shop in Tualatin, Oregon as an apology from the



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Plaintiff for disrupting the family the previous night (by trying to defend herself), resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

244.

The plaintiff was in shock for a long period of time, unable to maintain her daily responsibilities for several days afterward.

245.

Between August 2024 and April 2025, the plaintiff purchased and began wearing thick spandex bodysuits to sleep in an attempt to deter the defendant Jordan Ciampini from sexually abusing her after he chose to become drunk on a nightly basis despite the plaintiff's never-ending support and her begging him to go to rehab and get help with his substance abuse issues.

246.

In October 2024, the defendant Jordan Ciampini invited the plaintiff to attend a Halloween party with him, but then refused to allow the plaintiff to attend the party and instead the defendant Jordan Ciampini refused to celebrate the holiday with the plaintiff and their three children; the plaintiff took the three children trick-or-treating alone, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

247.

Between October 2024 and March 2025, the defendant Jordan Ciampini became increasingly hostile toward the plaintiff on a daily basis, screaming vulgarities and debasing names at the plaintiff, not permitting her to go upstairs or in their shared closet, attempting to prevent the plaintiff from going outside their home by physically restraining her on numerous occasions, and the defendant Jordan Ciampini refused the plaintiff's numerous demands that he move out of their family home due to the drastic escalation in the abuse the plaintiff was suffering as a result of the defendant's violent conduct toward her daily, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

248.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Between 2024 and 2025, the plaintiff's middle child informed her that the defendant Jordan Ciampini and plaintiff's youngest minor child, a toddler, exited the residence while solely within his care until located by the plaintiff's middle child, resulting in the plaintiff assuming nearly entire responsibility for the defendants being fearful for the safety of the young minors if left home with the defendant, resulting in the plaintiff experiencing extreme emotional distress for years.

249.

In December 2024, the defendant Jordan Ciampini became enraged with the plaintiff and poured a cup of water on her head while she was sitting in their bed having a panic attack, then he broke numerous Christmas decorations, and threw the Christmas tree to the ground, all while he holding their youngest minor child, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

250.

Subsequently, the defendant Jordan Ciampini began attempts to alienate the children, primarily the oldest child, from the Plaintiff by refusing to allow them to have private conversations together, moving into the childrens' bedroom, demanding the children observe his inconsistent and late bedtimes when he was intoxicated, stating to the children the Plaintiff was "tearing our family apart" and "ruining our family" the Plaintiff apologize to the children repeatedly for being their mother, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

251.

In 2025, the defendant Jordan Ciampini escalated his violent conduct by physically restraining their middle child, B. C. C., by grabbing their wrist firmly and roughly dragging them out of their room, despite the protests of the child and the plaintiff, the plaintiff actively engaged in safety planning activities, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

252.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

In February 2025, the plaintiff's maternal grandfather suddenly became fatally ill and the defendant refused to be sober so the plaintiff could visit him before he died or attend his funeral, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

253.

After the death of the plaintiff's maternal grandfather in February 2025, the defendant Jordan Ciampini's conduct began to violently escalate increasingly, and he refused to stop verbally attacking the plaintiff daily until she was in tears and having panic attacks, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

254.

On March 29th, 2025, the defendant Jordan Ciampini became irate with their middle child and forcefully grabbed their wrist squeezing tightly and dragged them out of their room despite the child resisting and screaming for the defendant to "stop" and "let me go," with the defendant only releasing the child to prevent the plaintiff from running downstairs to get her phone to call law enforcement, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

255.

The plaintiff filed for custody of their children on March 13, 2025 as a result of the continued and unrelenting abusive conduct by the defendant Jordan Ciampini, upon the advice of other co-defendants, within the plaintiff's home, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

256.

Then the defendant Jordan Ciampini obtained unauthorized access to the Plaintiff's electronic devices and deleted nearly all of the original photos taken by the plaintiff depicting several instances of the defendant's physical abuse of the plaintiff, except for some photos that



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

were previously printed by the plaintiff, resulting in the plaintiff experiencing extreme emotional distress for years.

257.

The defendant Jordan Ciampini's violent conduct, physical, sexual, mental, and verbal abuse exponentially increased toward the plaintiff after the custody case was initiated by the plaintiff creating a volatile, dangerous, environment for the plaintiff who feared for her life because of the history of abuse by the defendant Jordan Ciampini, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for years.

258.

In March 2025, at the plaintiff's request her immediate NFCU supervisor conducted brief research of the internal records of NFCU employees recently accessing and viewing the plaintiff's NFCU accounts, based on the defendant Jordan Ciampini stalking the plaintiff, being aware of her online activity with NFCU, and using her online activity with NFCU to monitor her daily movements.

259.

Between July 2024 and December 2024, the plaintiff's immediate NFCU supervisor in the security department communicated with the plaintiff that, as she had permitted, he had shared information regarding her domestic issues with Jordan Ciampini with NFCU leadership.

260.

Then between 2024 and 2026, NFCU supervisors and leadership worked directly with local law enforcement to monitor the daily activities of the plaintiff, including but not limited to monitoring her home, her movements through town and the state, her travel between her home and classes at the local university's law school, her daily movements between her home and her children's schools and extra-curricular activities, through numerous methods including utilizing city employees, local law enforcement, airplane arial surveillance, drone surveillance, and personal connections, resulting in the plaintiff experiencing extreme emotional distress for years.



Kimberly Bell
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

261.

Between 2022 and 2025, after the plaintiff relocated from Florida to Oregon, the plaintiff's immediate NFCU supervisor made numerous comments to plaintiff about his father-in-law's work with N.A.S.A. and the precision and strength of their satellite technology, enabling them to surveil anyone on planet earth, resulting in the plaintiff experiencing extreme emotional distress for years.

262.

The comments referenced in paragraph 260, resulted in the plaintiff feeling intimidated by the threat of surveillance and violations of the plaintiff's right to privacy by her NFCU supervisor due to her history and experience with the close ties between numerous NFCU employees who were co-conspirators with defendants Nolan Ciampini and Jordan Ciampini, resulting in the plaintiff experiencing extreme emotional distress for years.

263.

In 2025, to monitor the plaintiff's professional associations after she began serving indigent defendants through the law school's criminal defense clinic, NFCU leadership hired a local prior law enforcement officer as the plaintiff's new supervisor in the security and compliance department who was informed of the plaintiff's history of extensive domestic abuse and ongoing contested custody case resulting in the plaintiff experiencing extreme emotional distress for years.

264.

The supervisor immediately informed the plaintiff that he had a law enforcement buddy who had just moved to her local area in Oregon, resulting in the plaintiff experiencing extreme emotional distress for years.

265.

The plaintiff's new supervisor immediately informed her that he had a law enforcement buddy who had just moved to her local area in Oregon which intimidated the victim plaintiff due to the previous violations of her right to privacy by numerous NFCU employees and disclosing



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

the plaintiff's private information to defendants Nolan Ciampini and Jordan Ciampini, resulting in the plaintiff experiencing extreme emotional distress for years.

266.

The plaintiff believed her new ex-law enforcement supervisor acted as an agent of the state, in violation of the plaintiff's right to privacy when he conducted warrantless searches of the plaintiff's financial activity and when he conspired with other law enforcement officers to monitor the plaintiff's daily physical movements in the state of Oregon, through law enforcement surveillance via neighborhood Flock cameras, traffic cameras, officers, airplanes, drones, law enforcement informants, package delivery drivers, wiretapping the plaintiff's electronic devices, and other various methods, resulting in the plaintiff experiencing extreme emotional distress for years.

267.

In 2025, during the first team meeting, the plaintiff's new ex-law enforcement now NFCU supervisor was asked to share a funny story with the team and he shared a story about breaking the kneecaps of a detainee for trying to cash a fraudulent check while he was at a branch office—intimidating the plaintiff with his traumatizing story about over-use of force and police brutality although her supervisor received training relating to the trauma experience by domestic violence survivors, exploited elders, and other vulnerable individuals and he had prior knowledge of the victim's extensive history of domestic abuse, resulting in the plaintiff experiencing extreme emotional distress for years.

268.

The plaintiff's immediate supervisor confirmed her accounts had been access by numerous individuals, providing the plaintiff with the NFCU employees' names, employee identification numbers, phone numbers, and their supervisors' name (via internal NFCU chat) of the numerous individuals who recently utilized internal NFCU system to access and view the plaintiff's NFCU accounts; the plaintiff confirmed that none of these individuals had been authorized to access her



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

accounts and she informed her immediate supervisor that she recognized several of the employees had traceable connections to the defendant Nolan Ciampini, resulting in the plaintiff experiencing extreme emotional distress for years.

269.

Her immediate supervisor assured the plaintiff that the matter would be handled internally and that he could not update her about the investigation conducted regarding other employees utilizing internal NFCU systems to access her accounts for no legitimate business purpose, resulting in the plaintiff experiencing extreme emotional distress for years.

270.

Although NFCU leaders were previously informed of the plaintiff's extensive history as a domestic violence survivor, the plaintiff was denied access to any updates or information regarding any further research related to the violation of her privacy by NFCU employees utilizing internal NFCU systems to access and view her accounts for no legitimate business purpose, resulting in the plaintiff experiencing extreme emotional distress for years.

271.

To plaintiff's knowledge, the violations of her right to privacy by numerous NFCU employees mostly went uninvestigated and unresolved to her knowledge, shocking the conscious of the plaintiff, resulting in the plaintiff experiencing extreme emotional distress for years.

272.

The NFCU supervisor's story glorified over-use of force by law enforcement and constant surveillance caused further trauma to the plaintiff because of her history as a domestic violence survivor and the plaintiff previously being stalked by the defendants and other individuals, resulting in the plaintiff experiencing extreme emotional distress for years.

273.

The plaintiff was granted an Order of Protection against the defendant Jordan Ciampini on April 10th, 2025 by the Polk County Circuit Court of Oregon.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

274.

Between April 2025 and April 2026, the plaintiff was unable to obtain legal representation despite numerous attempts, and numerous violations of the order of protection by the defendant Jordan Ciampini, causing the plaintiff to experience severe emotional distress caused by having to represent herself as a *pro se* litigant as a result of the secondary trauma caused by the consistent exposure to her abusive history with the defendants.

275.

On October 5, 2025, the child middle of the plaintiff and defendant, suffered minor lacerations on their left hand while in the care of defendants Jordan Ciampini and Tahisha Buck at 10900 NE 2nd Avenue, Portland, Oregon 97211, resulting in the plaintiff experiencing extreme emotional distress.

276.

On or around November 17, 2025 the defendant Jordan Ciampini realized the contested custody case was trial-bound.

277.

On November 30, 2025, the oldest child of the plaintiff and defendant Jordan Ciampini, suffered severe second degree burns to his upper right thigh while in the care of defendant Jordan Ciampini, who took the injured child to be examined by Tahisha Buck at 10900 NE 2nd Avenue, Portland, Oregon 97211, rather than immediately seeking medical attention from a licensed physician, with the child experiencing cicatricial dyspigmentation on portions of the upper right thigh and causing extremely severe emotional distress to the plaintiff from the secondary trauma induced while treating the minor's wound between December 2025 and February 2026, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress since the incident.

278.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Tahisha Buck called the Plaintiff after examining the injured child and stated to the Plaintiff that she examined the minor child's injury and she advised the defendant Jordan Ciampini to take him to a clinic because the burn caused Epidermal separation and she was unable to provide the proper medical treatment to the minor child, resulting in the plaintiff experiencing extreme emotional distress for years.

279.

The permanent serious and protracted disfigurement of the minor child's leg occurred thirteen days after the defendant Jordan Ciampini received the plaintiff's for request for admission in their custody case, which included a question regarding whether the defendant had taken the minor child to a medical appointment since moving to Oregon, resulting in the plaintiff experiencing extreme emotional distress.

280.

Three days after the severe injury to the minor child, the plaintiff received the defendant Jordan Ciampini's response to the first request for admissions, responding in the affirmative regarding the question mentioned in paragraph 278, when prior to the injury mentioned in paragraph 276 the answer to the question would have been negative.

281.

The injury mentioned in paragraph 276 caused the minor child to miss several days of school and five weeks of the competitive soccer league season, experience severe pain and suffering and emotional distress, resulting in the plaintiff experiencing extreme emotional distress for years.

282.

On or around August 4, 2026, the youngest child of the defendant and plaintiff suffered burns to the palm of his hand while in the care of defendants Jordan Ciampini and Tahisha Buck at 10900 NE 2nd Avenue, Portland, Oregon 97211, resulting in the plaintiff experiencing extreme emotional distress for years.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

283.

Due to the plaintiff's traumatic history with hospitals—due to her maternal grandmother's 12 year battle with cancer—she is averse to traumatic injuries, doctors, hospitals, and traditional medications.

284.

On March 31st, 2026 the plaintiff was informed that her mother's first cousin, who was like an Aunt to the plaintiff, had recently died, resulting in the plaintiff experiencing extreme emotional distress.

285.

On April 13th, 2026 the plaintiff experienced a debilitating triggering event resulting in severe emotional distress, flashbacks, intrusive thoughts, insomnia, reduced appetite, exacerbated her anxiety, and the inability to complete to her daily functions as a financial analyst with NFCU resulting in the plaintiff being placed on disability beginning on April 14th, 2026, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress since the occurrence of this incident.

286.

On April 14th, 2026 the plaintiff began virtual treatment by a new physician who prescribed the plaintiff several medications for anxiety and depression.

287.

On April 28th, 2026 the plaintiff received a phone call from Volusia county Florida informing her that her mother, Sandra Bell had recently died alone in her small apartment, resulting in the plaintiff experiencing extreme emotional distress since the occurrence of this incident.

288.

Several weeks later, the plaintiff began to experience significant adverse mental and physical health impacts from the medications prescribed to the plaintiff, resulting in the plaintiff experiencing extreme emotional distress.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

289.

In May 2026, the plaintiff began treatment by a new physician who informed the plaintiff that she had erroneously been prescribed a medication which exacerbated the plaintiff's health issues, upon the plaintiff's disclosure of suffering severe adverse effects to the medication including but limited to—increased intrusive thoughts, increased obsessive compulsive disorder tendencies, increased anxiety, increased brain-fog, increased fatigue, increased nightmares, increased insomnia, increased impacts from major depressive disorder, and increased self-isolation; however, N.P. Sanford continued to prescribe the medication to the plaintiff to take once daily at night.

290.

On June 17th 2026, the plaintiff was in a major automobile accident resulting in a concussion and the total destruction of her 2019 white Nissan Sentra, immediately after defendant Jordan Ciampini violated the plaintiff's Order of Protection at the Flying J in Aurora, Oregon when he exited his vehicle less than 50 feet away from the plaintiff when she dropped off their children for parenting time with the defendant Jordan Ciampini, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress since the occurrence of the incident.

291.

In June 2026, the plaintiff began treatment by a new physician who informed the plaintiff she should never have been prescribed Gabapentin based on her health conditions and personal responsibilities.

292.

Between 2025 and 2026, defendant Tahisha Buck, a licensed registered nurse in the state of Oregon who holds a degree as a Doctor of Philosophy in Nursing, attempted to criminalize the victim plaintiff, by threatening to file numerous retaliatory unfounded and false reports of child abuse against the plaintiff after learning the defendant Jordan Ciampini expressed lingering affection for the plaintiff over a message when he was intoxicated, resulting in Plaintiff



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

experiencing increased anxiety, worsening major depressive disorder, increased insomnia, and extreme emotional distress, in addition to resulting in the plaintiff experiencing extreme emotional distress.

293.

Between 2024 and 2026, the plaintiff experienced a decline in her mental health as a result of the constant stalking by the defendant Jordan Ciampini and NFCU's indirect monitoring of the plaintiff which she interpreted as NFCU conspiring with her abusers Nolan Ciampini and Jordan Ciampini to stalk her to keep them informed about her movements based on her history of domestic abuse, the constant monitoring of the plaintiff by her abusers through the use of NFCU internal systems and workplace culture since she became employed by NFCU in 2015, and by medical professionals prescribing incorrect medication for the plaintiff and continuing her on the medication despite the plaintiff disclosing the severe adverse mental and physical health symptoms she had begun experiencing since being prescribed the medication, resulting in the plaintiff experiencing extreme emotional distress for years.

294.

Daily, the plaintiff experiences severe emotional distress as a result of being diagnosed with major depressive disorder, anxiety, C-PTSD, nightmares, insomnia, migraines, suffers from flashbacks of abusive conduct, and other health issues, being unable to perform her beloved duties as a financial analyst reporting on elder and vulnerable person abuse, and the significant loss of personal connections, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress on a daily basis.

## CAUSES OF ACTION

### I. COUNT I – Intentional Infliction of Emotional Distress (IIED)

**Against Defendants Nolan Ciampini, Jordan Ciampini, Tahisha Buck, and Navy Federal Credit Union**



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

**1. Legal Standard**

Oregon state tort IIED law governs Federal IIED claims absent an independent federal common law standard for IIED, with these claims grounded in Oregon's civil stalking statute Or. Rev. Stat. Ann. § 30.866, which permits a person to bring a civil action in circuit court for a stalking protective order, damages, or both, upon proof by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly engaged in repeated and unwanted contact that alarmed or coerced the petitioner, and that the contact caused reasonable apprehension regarding personal safety. Or. Rev. Stat. Ann. § 30.866 (2017).

"Contact" under Or. Rev. Stat. Ann. § 163.730 is defined broadly. It expressly includes "the use of an electronic service, application, device or other electronic means to obtain, monitor or interfere with the location, communication or activities of the other person, without the consent of the other person," as well as "sending or making written or electronic communications in any form to the other person." Or. Rev. Stat. Ann. § 163.730 (2019). This expansive statutory definition encompasses GPS tracking, social media monitoring, surveillance applications, and unwanted electronic messaging—the full range of tools commonly deployed in domestic violence stalking contexts. A separate provision, Or. Rev. Stat. Ann. § 163.715, prohibits the installation of a GPS tracking device on a vehicle without the owner's consent—conduct that may independently support both a stalking claim and companion tort theories. Or. Rev. Stat. Ann. § 163.715 (2019). The Oregon Supreme Court confirmed that the criminal mental-state definitions under ORS 161.085 apply to the civil stalking statute, clarifying the requisite intent for both civil and related tort proceedings. *Delgado v. Souders*, 334 Or. 122 (2002). In *S.L.L. v. MacDonald*, the Oregon Court of Appeals further held that telephonic threats from an ex-partner constitute qualifying contacts under O.R.S. § 30.866 in a domestic violence context, illustrating the statute's application to recurring abusive communications. *S.L.L. v. MacDonald*, 267 Or. App. 628 (2014).



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Under Oregon IIED law the plaintiff is required to establish (1) the defendant intended to cause the plaintiff severe emotional distress; (2) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct; and (3) the defendant's acts in fact caused severe emotional distress. The Oregon Supreme Court previously codified this three-part IIED framework and refined it in *McGanty*, when the court corrected prior decisions that have mistakenly required a defendant to have acted with the purpose of inflicting severe emotional distress, instead adopting the Restatement Second of Torts § 46 and holding that the intent element is satisfied where the "actor desires to inflict severe emotional distress, and also where they know that such distress is certain, or substantially certain, to result from their conduct." *McGanty v. Staudenraus,* 321 Or. 532 (1995).

The standard articulated in *Twombly*, requires "a complaint with enough factual matter (taken as true) to *suggest* that an agreement was made" and establishes the crucial question as whether "challenged [conduct] stem[s] from independent decision or from an agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Additionally, *Iqbal* requires a pleading of "sufficient factual matter" to show the elements of the claim. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The standard applied by the 9th Circuit in *Lacey v. Maricopa County*, establishes that a complaint states sufficient facts:

> "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Lacey v. Maricopa Cnty.*, 693 F. 3d 896, 911 (9th Cir. 2011).



**Kimberly Bell**
1732! Toucan Street NW, Saem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

The 9th Circuit standard requires Plaintiff to allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207 (W.D. Wash. 2015).

Recovery of civil damages are authorized under amended 18 U.S.C. § 2520 for IIED claims resulting from electronic surveillance which states:

> "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person (a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1000, whichever is higher; (b) punitive damages, (c) reasonable attorney fees and other litigation costs." 18 U.S.C. § 2520.

A complete defense exists for good faith reliance on a court order or legislative authorization. 18 U.S.C. § 2520.

IIED is a recognized tort under Oregon law, regardless of whether the claim is barred by workers' compensation exclusivity, because Oregon's IIED framework is restated in *Dumanovskiy* as requiring intent, outrageousness, and severe emotional distress. *Dumanovskiy v. Oregon Youth Authority*, A181340 (Or. Ct. App. 2025). IIED claims can survive summary judgment when the evidence supports extreme and outrageous conduct by institutional actors. *Doe v. Brown University*, No. 20-2023 (1st Cir. 2022).

**2. Defendants' Conduct**

Defendant Jordan Ciampini's conduct, as alleged throughout the Statement of Facts, was a continuous course of coercive control from approximately 2010 through 2026. Beginning with



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

intimidation during the early relationship, including weapon displays, threats, false accusations of infidelity, isolation from education and employment opportunities, and monitoring of Plaintiff's communications, Jordan Ciampini allegedly escalated into years of physical violence, sexual abuse, reproductive coercion, economic domination, property destruction, and threats designed to keep Plaintiff dependent, afraid, and unable to obtain legal assistance or safely separate from him.

The Statement of Facts alleges that Jordan Ciampini repeatedly used Plaintiff's known trauma, pregnancies, custody concerns, employment obligations, law-school goals, and financial responsibilities as points of leverage. His alleged conduct included breaking Plaintiff's tooth, slamming her head into concrete, fracturing her ankle, restraining her during non-consensual sexual acts, strangling her in July 2024, threatening and using weapons, interfering with contraception and pregnancy decisions, forcing Plaintiff to incur high-interest loans for the Oregon move, withholding financial support, forcing separation from family support, and escalating abuse after Plaintiff filed for custody and obtained an order of protection.

Defendant Nolan Ciampini allegedly participated in and facilitated that course of conduct by using his NFCU position, access, relationships, and knowledge of internal systems to monitor or help others monitor Plaintiff's financial accounts, workplace schedule, workplace availability, and workplace associations. Plaintiff alleges that this electronic monitoring allowed Jordan Ciampini to know Plaintiff's movements, financial activity, private decisions, and workplace conduct, thereby intensifying Jordan Ciampini's control, threats, and retaliation.

Plaintiff further alleges that Harold Eugene Ciampini, Tahisha Buck, Nurses et al., Gary Buck, and NFCU contributed to the distress by assisting, encouraging, enabling, or failing to stop conduct described in the Statement of Facts, including the alleged early agreement involving the Nissan Versa, the later alleged agreement to replace Plaintiff as mother of the children, the monitoring and misuse of financial information, the failure to protect Plaintiff after notice of unauthorized access and domestic abuse, and conduct causing Plaintiff to fear for her safety and



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

her children's safety. Taken together, these alleged acts were intentional or reckless, exceeded the bounds of socially tolerable conduct, and directly caused Plaintiff severe emotional distress, panic attacks, flashbacks, intrusive thoughts, insomnia, migraines, anxiety, major depressive disorder, C-PTSD symptoms, loss of relationships, economic injury, and disability from work beginning April 14, 2026.

### 3. Damages

Plaintiff suffered physical harm, emotional distress, loss of liberty, economic losses, and other damages according to proof. Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under § 1988, and all other appropriate relief.

## II. COUNT II – 42 U.S.C. § 1983 – Conspiracy to Violate Civil Rights

**Against Defendant Nolan Ciampini, Jordan Ciampini, and Navy Federal Credit Union (acting jointly with federal agents)**

### 1. Legal Basis

Under 42 U.S.C. § 1983, private individuals and state actors who conspire to violate constitutional rights are liable when they engage in joint action, coordinated conduct, or mutual assistance that results in a deprivation of rights secured by the Constitution. Civil conspiracy is a theory that renders multiple actors jointly liable for the underlying tort of IIED requiring (1) a combination of two or more persons, (2) an object to be accomplished, (3) meeting of the minds on object or course of action, (4) one or more unlawful overt acts, and (5) damages as a proximate result. *In re Paulson*, No. ADV 11-03309-RLD, 2012 WL 5177950 (Bankr. D. Or. Apr. 26, 2012). In *Peterson v. Miranda*, the court held co-conspirators may be held liable for IIED inflicted on a domestic violence victim when the abusive partner enlists third parties to participate in jointly stalking or electronic surveillance, requiring that to establish a claim for civil conspiracy "a plaintiff must establish: (1) the commission of an underlying tort; and (2) an agreement between



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

the defendants to commit that tort." *Peterson v. Miranda*, 57 F. Supp. 3d 1271, 1278 (2014). A plaintiff must plead "specific overt acts and concrete evidence of an agreement between co-conspirators." *Houston v. Mile High Adventist Acad.*, 846 F. Supp. 1449 (D. Colo. 1994).

As stated above, private parties become state actors when they are "willful participants in joint action" with government officials. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Private individuals who conspire with state actors are liable under § 1983 even if the state actor is immune. *Dennis v. Sparks*, 449 U.S. 24 (1980). Conspiracy exists where private individuals and government agents engage in a "substantial degree of cooperation" to accomplish a constitutional violation. *Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002). A § 1983 conspiracy requires an agreement or meeting of the minds to violate constitutional rights. *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010).

Although Utah requires the elements must be proven by clear and convincing evidence, this court is not bound to Utah standards in unpublished opinions. *Combs v. SafeMoon LLC*, No. 2:22-CV-00642-DBB-JCB, 2024 WL 1347409 (D. Utah Mar. 29, 2024). Although not binding, federal criminal prohibition of electronic stalking principles should be considered as informative to this court, as there is no interpersonal exception to Title III liability, affirming civil liability for that a spouse who tapes another spouse's phone calls and co-conspirators who (1) participated, or (2) benefitted from illegal interception. *Thompson v. Dulaney*, 970 F. 2d 744 (10th Cir. 1992).

**2. Defendants' Conduct**

Plaintiff alleges that Defendants Jordan Ciampini, Nolan Ciampini, and NFCU engaged in coordinated conduct that deprived Plaintiff of privacy, safety, liberty, and meaningful açcess to legal redress. The Statement of Facts alleges that Jordan Ciampini used repeated physical abuse, sexual abuse, reproductive coercion, threats, weapon-related intimidation, economic abuse, and custody retaliation to isolate Plaintiff and prevent her from safely leaving or obtaining counsel. It



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

further alleges that Nolan Ciampini used his NFCU position and relationships to monitor, facilitate monitoring of, or induce others to monitor Plaintiff's financial accounts, work schedule, workplace availability, and workplace associations, providing information that Jordan Ciampini allegedly used to stalk, intimidate, and control Plaintiff.

The alleged overt acts include unauthorized NFCU account access, internal workplace monitoring, dissemination or use of Plaintiff's private financial and employment information, intimidation through workplace relationships and law-enforcement connections, failure to protect Plaintiff after she reported the unauthorized access in March 2025, and continued conduct after Plaintiff obtained an order of protection in April 2025. Plaintiff alleges that these acts did not occur independently, but reflected a shared purpose or meeting of the minds to keep Plaintiff under surveillance, undermine her credibility, restrict her access to assistance, and increase the danger she faced in her home, workplace, custody case, and daily life.

As a direct and proximate result of the alleged conspiracy, Plaintiff suffered loss of privacy, fear for her safety and her children's safety, impairment of her ability to work and attend law school, worsening emotional and physical symptoms, economic harm, and disability beginning April 14, 2026. These allegations support Plaintiff's claim that Defendants acted jointly through concrete overt acts to deprive her of federally protected rights.

**3. Damages**

Plaintiff suffered physical harm, emotional distress, loss of liberty, economic losses, and other damages according to proof. Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under § 1988, and all other appropriate relief.

## III. COUNT III – Restatement (Second) of Torts § 652A – Invasion of Privacy

**Against Defendants Nolan Ciampini, Jordan Ciampini, and Navy Federal Credit Union (acting jointly with federal agents)**



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

**1. Standard of Review**

A complaint must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action," to survive a challenge by a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must indicate more than mere speculation of a right to relief. *Id.* When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558. A complaint may be lacking for one of two reasons: (i) absence of a cognizable legal theory, or (ii) insufficient facts under a cognizable legal claim. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). In ruling on a motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

**2. Legal Basis – Invasion of Privacy**

Oregon recognizes four distinct invasion of privacy torts, restated by the court in *Perez-Denison*, drawn from the Restatement (Second) of Torts § 652A: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) false light, and (4) public disclosure of private facts. *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065 (D. Or. 2012).

A plaintiff must prove three elements to prevail on a right to privacy claim based on the theory of intrusion upon seclusion, including (1) an intentional intrusion, physical or otherwise; (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person. *Mauri v. Smith*, 324 Or. 476 (1996).

"Intentional intrusion" was defined by the Oregon Supreme Court ,as a matter of first impression: "an actor commits an intentional intrusion if the actor either desires to cause an unauthorized intrusion or believes that an unauthorized intrusion is substantially certain to result from committing the invasive act in question," explaining that a person intrudes by "thrusting



Kimberly Bell
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

himself or herself in without invitation, permission, or welcome," meaning that consent negates this element entirely. *Id.* Critically, the intrusion must be an affirmative act of prying. In *Humphers v. First Interstate Bank of Oregon*, the Oregon Supreme Court distinguished intrusion from wrongful disclosure, holding that a defendant who did not "pry into any personal facts that he did not know" cannot be held liable for intrusion; "the point of the claim . . . is not that he pried into a confidence but that he failed to keep one." *Humphers v. First Interstate Bank of Oregon*, 298 Or. 706 (1985).

Secondly, the intrusion must be upon the plaintiff's solitude, seclusion, or private affairs or concerns, occurring through physical entry or "the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs." *Reed v. Toyota Motor Credit Corp.*, 301 Or. App. 825 (2020). Entry into a space private without consent, such as a home or hotel room, and the installation of a GPS tracking device on a vehicle have been recognized as actionable forms of intrusion. *Mauri v. Smith*, 324 Or. 476 (1996). Protected health information (PHI) has been recognized by federal courts in Oregon as sufficiently private subject matter, noting that Congress's enactment of HIPPA reflects a societal determination that reasonable people strongly object to their medical records being inappropriately accessed. *K.L. v. Legacy Health*, No. 3:23-CV-1886-SI, 2024 WL 4794657 (D. Or. Nov. 14, 2024).

Lastly, the intrusion must be of a character that a reasonable person would find highly offensive, an objective standard against which the court considers factors including: the degree of intrusion, the context and circumstances surrounding it, the intruder's motives and objectives, the setting into which the defendant intruded, and the expectations of those whose privacy is invaded. *Reed v. Toyota Motor Credit Corp.*, 301 Or. App. 825 (2020).

### A. Federal Computer Fraud and Abuse Act (CFAA)

The federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(A), specifically criminalizes and creates civil liability for intentionally accessing a computer "without



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information contained in a financial record of a financial institution"18 U.S.C.A. § 1030 (West 2010).
In *LVRC Holdings LLC v. Brekka*, the Ninth Circuit established that whether an employee has "authorization" under the CFAA turns on whether the employer actually granted permission to access the specific data at issue—not on an employee's general access to the employer's computer systems. *LVRC Holdings LLC v. Brekka*, 581 F. 3d 1127 (9th Cir. 2009). The en banc Ninth Circuit in *United States v. Nosal* further clarified that "exceeds authorized access" applies to individuals who have only limited access to files or data and exceed restrictions on that access—meaning that an employee authorized to access only certain member accounts who accesses a coworker's personal account without job-related justification likely acts "without authorization" or "exceeds authorized access" with respect to that specific account data. *United States v. Nosal*, 676 F. 3d 854 (9th Cir. 2012).

**B. Gramm-Leach-Bliley Act (GLBA)**

Additionally, the plaintiff is protected by the Gramm-Leach-Bliley Act (GLBA) which prohibits obtaining or causing the disclosure of "customer information of a financial institution" through a false, fictitious, or fraudulent statement or representation to a customer of a financial institution. 15 U.S.C. § 6821(a)(2). "Customer information of a financial institution" is defined as any information maintained by or for a financial institution which is derived from the relationship between the institution and its customers. *Id.* at § 6827(2). A "[f]inancial institution" includes any entity engaged in providing financial services to customers who maintain an account or other financial account or relationship with the institution. *Id.* at § 6827(4)(A).
In *Federal Trade Commission v. Doxo, Inc.*, the court confirmed that the GLBA prohibition extends broadly to false or fraudulent representations in obtaining financial institution customer information, with no need to "establish that [Doxo] made a literally false statement." *Federal Trade Commission v. Doxo, Inc.*, 771 F. Supp. 3d 1162 (2025).



**Kimberly Belll**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

### C. Oregon Computer Crime Statute

Although not a civil claim, plaintiff requests the court take judicial notice that the allegations, required to be "taken as true" by the court, constitute computer crimes under Oregon law, ORS § 164.377(4), stating any person who "knowingly and without authorization uses, accesses or attempts to access any computer system, computer network, or any computer software, program, documentation or data" commits a Class A misdemeanor computer crime. ORS § 164.377 (2026).

The "no reasonable expectation of privacy" defense is not a recognized defense under the CFAA, the GLBA, ORS § 164.377, or ORS § 165.800. Those statutes do not require the victim to demonstrate a reasonable expectation of privacy—they impose affirmative duties on persons not to access or disclose financial data without authorization. The Ninth Circuit's decision in Theofel v. Farey-Jones confirms that statutory privacy protections reflect "Congress's judgment that [electronic data] users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility," independent of constitutional privacy analysis. *Theofel v. Farey-Jones*, 359 F. 3d 1066 (9th Cir. 2004). Similarly, account holders retain a reasonable expectation of privacy in their financial records against unauthorized access by private actors according to *Carpenter v. United States*, which recognized that the third-party doctrine has limits when comprehensive personal information is involved. *Carpenter v. United States*, 585 U.S. 296 (2018).

### 3. Defendant's Conduct

Plaintiff alleges that Defendants Nolan Ciampini, Jordan Ciampini, and NFCU invaded Plaintiff's privacy by intentionally accessing, monitoring, using, or facilitating access to Plaintiff's private financial records, NFCU account activity, work schedule, online workplace availability, workplace associations, communications, and daily movements without Plaintiff's consent and



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

without a legitimate business purpose. The Statement of Facts alleges that NFCU employees accessed Plaintiff's accounts between 2015 and 2026, that unauthorized access increased or continued between 2023 and 2026, and that Plaintiff's supervisor confirmed in March 2025 that numerous individuals had accessed her accounts without a legitimate business purpose.

Plaintiff alleges that Nolan Ciampini used his NFCU position, system knowledge, and workplace relationships to cause or facilitate those intrusions, and that Jordan Ciampini used the information obtained through those intrusions to track Plaintiff's movements, confront her about private financial and reproductive decisions, intensify abuse after learning of annual bonuses and abortion services, and maintain coercive control. Plaintiff further alleges that NFCU knew or should have known that the unauthorized access involved a domestic-violence victim reporting stalking and abuse, yet failed to secure Plaintiff's private information, stop further misuse, or protect her from retaliation and intimidation.

The alleged intrusions concerned Plaintiff's most private affairs, including financial records, employment activity, physical location, safety planning, reproductive-health decisions, custody litigation, and domestic-violence circumstances. A reasonable person would find such unauthorized access and use highly offensive, particularly where the information was allegedly used to facilitate stalking, threats, economic pressure, and violence. As a direct result, Plaintiff suffered severe emotional distress, panic attacks, anxiety, loss of privacy, fear, workplace impairment, and disability from her NFCU duties beginning April 14, 2026.

**3. Damages**

Plaintiff suffered physical harm, emotional distress, loss of liberty, economic losses, and other damages according to proof. Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under § 1988, and all other appropriate relief.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

## IV. COUNT IV – Constitutional Due Process & Right to Petition—FTCA and *Bivens* Claim

**Against Defendant United States**

### 1. Legal Basis

#### A. FTCA Claim

The FTCA provides for a claim against the United States for the "wrongful act or omission of any employee of the Government ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act ... occurred." 28 U.S.C. § 1346(b)(1). According to *Ramirez*, a plaintiff must allege a wrongful act by either (1) officers or employees of a federal agency, (2) "persons acting on behalf of a federal agency in an official capacity," or (3) by a government contractor over whose "day-to-day operations" the government maintains "substantial supervision" to state a claim within the FTCA's limited waiver of sovereign immunity. *Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207 (W.D. Wash. 2015).

#### B. *Bivens* Claim

In addition to or in the alternative as applicable, Plaintiff brings this claim pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, which authorizes a direct cause of action for damages against federal officers who violate constitutional rights. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Supreme Court held that federal courts possess the power to "adjust their remedies so as to grant the necessary relief" for constitutional violations committed by federal agents acting under federal authority.



Kimberly Bell
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Federal jurisdiction is proper under *Bell v. Hood*, which recognizes that federal courts may hear suits seeking damages for constitutional violations and that such claims arise under federal law. *Bell v. Hood*, 327 U.S. 678 (1946).

**2. Constitutional Rights at Issue**

***a. Fifth Amendment – Due Process Clause***

Federal officers violate the Fifth Amendment when they engage in conduct that is arbitrary, abusive, retaliatory, or deliberately indifferent to a citizen's protected liberty interests. Under *Bivens*, damages are available where federal agents, acting under color of federal authority, deprive a person of liberty or property without due process of law and where no alternative remedial scheme forecloses a judicial remedy. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

***b. First Amendment – Right to Petition the Government for Redress of Grievances***

The First Amendment protects the right of individuals to petition courts, agencies, and government officials for redress. Retaliation, obstruction, interference, or punitive action taken by federal officers in response to a citizen's attempt to petition the government constitutes a violation of the Petition Clause. Under *Bivens*, federal courts may infer a damages remedy for First Amendment violations when federal officers retaliate against or obstruct protected petitioning activity and no special factors counsel hesitation. *Id.* The Supreme Court's holding in *Counterman v. Colorado*, requiring that for the imposition of speech-based stalking communications, the speaker must have acted with at least recklessness—a subjective awareness that the communications could be understood as threatening or harassing—must be considered where the stalking campaign includes repeated electronic communications (texts, emails, social media messages). *Counterman v. Colorado*, 600 U.S. 66 (2023).

**2. Defendant's Conduct**



Kimberly Belll
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Plaintiff alleges that the United States, through federal officers, federally connected actors, and private actors allegedly acting jointly with governmental authority, deprived Plaintiff of due process and interfered with her right to petition for redress by denying meaningful access to protection, legal assistance, and effective reporting mechanisms despite repeated notice of abuse, stalking, unauthorized surveillance, and escalating danger. The Statement of Facts alleges that Plaintiff was unable to obtain effective legal relief during years of domestic violence, was advised to hire counsel she could not afford, was denied meaningful help after reporting harassment and solicitation in 2019, and remained unable to secure representation during the contested custody case and after the April 2025 order of protection.

Plaintiff further alleges that governmental or law-enforcement-connected actors participated in or permitted surveillance and intimidation rather than providing meaningful protection, including alleged monitoring of Plaintiff's home, movements, travel to law school, child-related activities, and daily activities after NFCU supervisors learned of her domestic-violence history and custody case. Plaintiff alleges these actions and omissions were arbitrary, deliberately indifferent, retaliatory, and oppressive because they occurred after knowledge of a specific risk of violence, unauthorized account access, order-of-protection violations, and Plaintiff's ongoing efforts to seek legal redress.

**3. Absence of Alternative Remedies**

No alternative remedial scheme provided Plaintiff with a meaningful avenue for redress where the alleged conduct involved repeated failure to protect, obstruction of access to legal relief, retaliation for reporting and petitioning activity, and conduct that allegedly increased Plaintiff's exposure to domestic violence, surveillance, and emotional injury.

**4. Damages**



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

As a direct and proximate result, Plaintiff alleges she suffered loss of access to meaningful legal protection, deprivation of liberty and safety, interference with her petitioning activity, emotional distress, humiliation, economic loss, worsening trauma symptoms, disability from work beginning April 14, 2026, and other damages according to proof.

Plaintiff seeks compensatory damages, punitive damages where permitted, declaratory relief, and any other relief the Court deems just and proper.

## V. COUNT V – 42 U.S.C. § 1983 – State-Created Danger

**Against Defendants Nolan Ciampini, Jordan Ciampini, and Navy Federal Credit Union (acting jointly with federal agents)**

### 1. Legal Basis

This claim is brought under 42 U.S.C. § 1983, which provides a cause of action against any person who, acting under color of state law, deprives an individual of rights secured by the Constitution. The state-created danger doctrine is a recognized substantive Due Process theory arising under the Fourteenth Amendment Due Process Clause, which prohibits state actors from affirmatively placing individuals in danger with deliberate indifference to known or obvious risks.

***Ninth Circuit Controlling Authority***

The Ninth Circuit recognizes the doctrine and applies it where state actors affirmatively act, increase the risk of harm, and do so with deliberate indifference to the plaintiff's safety. The Ninth Circuit held that officers may be liable under § 1983 when they affirmatively create or expose an individual to danger, especially when they assure protection and then act in a way that increases the risk of harm. The court emphasized that liability attaches when officers take actions that "left the plaintiff in a situation more dangerous than the one in which they found her." *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006).



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

***Joint Action / Federal Participation***

When private individuals act jointly with federal agents, they may be treated as state actors under § 1983 according to *Lugar v. Edmondson Oil Co.* which held A private party becomes a state actor when they are a "willful participant in joint action with the State or its agents." *Lugar v. Edmondson Oil Co.*,457 U.S. 922 (1982). Additionally, in *Franklin v. Fox*, the court held joint action exists where private individuals and government agents act in concert to deprive constitutional rights. *Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002).

**2. Defendant's Conduct**

Plaintiff alleges that Defendants affirmatively created or increased danger to Plaintiff by combining domestic abuse, unauthorized surveillance, workplace monitoring, and institutional inaction after notice. The Statement of Facts alleges that Jordan Ciampini escalated violence and coercive control when Plaintiff pursued employment stability, law school, separation, custody relief, abortion services, and protection from abuse. It further alleges that Nolan Ciampini and NFCU-related employees used or facilitated access to Plaintiff's NFCU accounts, work schedule, workplace availability, and associations, allowing Plaintiff's private information to be used to track, intimidate, and retaliate against her.

Plaintiff alleges that Defendants knew of the specific and escalating danger because Plaintiff reported domestic abuse to NFCU supervision in 2024, reported unauthorized account access in March 2025, identified connections between account access and the Ciampini defendants, filed for custody on March 13, 2025, obtained an order of protection on April 10, 2025, and continued to report or experience violations, surveillance, intimidation, and child-safety concerns. Despite that notice, Defendants allegedly failed to protect Plaintiff and instead permitted or participated in conduct that increased her exposure to danger.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

By allegedly transforming Plaintiff's financial accounts, workplace systems, home life, custody proceedings, and movements into tools of surveillance and coercive control, Defendants left Plaintiff more vulnerable than she would have been absent their conduct. Plaintiff alleges Defendants acted with deliberate indifference to known and obvious risks of physical violence, sexual violence, retaliation, economic harm, loss of legal redress, and severe emotional distress, causing Plaintiff fear, loss of security, worsening trauma symptoms, economic injury, and disability from work beginning April 14, 2026.

**3. Damages**

As a direct and proximate result of Defendants' constitutional violations, Plaintiff suffered: Physical injury; Severe emotional distress; Loss of liberty and security; Economic losses; Ongoing trauma and fear; Other damages according to proof.

Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under 42 U.S.C. § 1988, and all other relief the Court deems just and proper.

## VI. COUNT VI – 42 U.S.C. § 1983 – Failure to Protect—*Bivens* Claim Against Defendant United States

**1. Legal Basis**

Under 42 U.S.C. § 1983, state actors violate the Fourteenth Amendment when they fail to protect an individual from known and foreseeable dangers, particularly when they have affirmatively created or enhanced the danger. The Ninth Circuit recognizes failure-to-protect liability where officials act with deliberate indifference to a substantial risk of harm. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, establishes that while the state generally has no duty to protect individuals from private violence, liability arises where the state creates or enhances the danger or where a special relationship exists. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989). Officers are liable when they fail to protect after creating or heightening a



Kimberly Bell
1732 Toucan Street N.W., Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

known danger. The Ninth Circuit held that deliberate indifference exists when officers know of a specific threat and act in a way that increases the risk. *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006). Liability attaches where officers affirmatively worsen a person's situation and then fail to protect them from the danger they created. *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997). Failure to protect after affirmative conduct that exposes a plaintiff to foreseeable harm constitutes a constitutional violation. *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989).

**2. Defendant's Conduct**

Plaintiff alleges that the United States failed to protect her after actual or constructive notice that she faced a specific and escalating risk of domestic violence, stalking, surveillance, custody retaliation, and deprivation of legal redress. The Statement of Facts alleges that Plaintiff sought help from law enforcement in 2019, sought legal and community assistance after the July 2024 assault, informed NFCU supervision about escalating domestic abuse in 2024, filed for custody in March 2025, obtained an order of protection in April 2025, and continued to experience violations, intimidation, and child-safety concerns.

Despite notice of these risks, Plaintiff alleges that federal, law-enforcement-connected, or government-associated actors failed to intervene, investigate, warn, or prevent further harm, and instead participated in or permitted surveillance and intimidation that increased Plaintiff's vulnerability. This alleged failure occurred despite known facts including Jordan Ciampini's history of physical and sexual violence, weapon-related threats, economic coercion, order-of-protection violations, unauthorized financial-account monitoring, injuries to the children while in Jordan Ciampini and Tahisha Buck's care, and Plaintiff's repeated inability to obtain representation.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

By failing to protect Plaintiff after allegedly creating, increasing, or knowingly permitting the danger, Defendant United States acted with deliberate indifference to Plaintiff's safety, bodily integrity, privacy, liberty, and right to petition for redress. Plaintiff alleges resulting physical injury, severe emotional distress, panic attacks, flashbacks, intrusive thoughts, insomnia, migraines, disability from work beginning April 14, 2026, and other damages.

**1. Damages**

Plaintiff suffered physical injury, emotional distress, loss of liberty, economic harm, and other damages according to proof. Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under § 1988, and all appropriate relief.

## VII. COUNT VII – Claims Against Navy Federal Credit Union—Constitutional & Tort Against Defendant NFCU

**1. Legal Basis**

Plaintiff brings this claim against Navy Federal Credit Union (NFCU) for constitutional violations under 42 U.S.C. § 1983, federal common-law tort principles, governed by Oregon tort law. Although NFCU is a private entity, it is liable under § 1983 when it acts jointly with federal agents or becomes a willful participant in joint action with government officials.

In the alternative, NFCU is also liable under federal and Oregon tort principles for strict liability, negligent, reckless, or intentional conduct that foreseeably harms Plaintiff.

**A. *Constitutional Violations Under 42 U.S.C. § 1983***

**a. Private Entities Acting Under Color of Law**

As previous stated in claims above, a private party becomes a state actor when it is a "willful participant in joint action with the State or its agents." Joint participation with government officials satisfies the § 1983 state-action requirement. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

(1982). Private individuals who conspire with state actors are liable under § 1983 even if the state actor is immune. The Court held that joint participation in unconstitutional conduct transforms private parties into state actors. *Dennis v. Sparks*, 449 U.S. 24 (1980). State action exists where there is "pervasive entwinement" between a private entity and government officials. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001). Joint action exists where private individuals and government agents engage in a "substantial degree of cooperation" to accomplish a constitutional violation. *Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002).

**b. Constitutional Rights at Issue**

NFCU is liable for constitutional violations when acting jointly with federal agents to: Interfere with Plaintiff's First Amendment rights (petitioning, speech, retaliation); Violate Fourth Amendment rights (unlawful search, seizure, disclosure of financial records); Violate Fifth Amendment rights (due process, arbitrary deprivation of liberty or property); Participate in surveillance, targeting, or retaliatory conduct coordinated with federal officials.

**2. Defendant Conduct**

NFCU allegedly engaged in constitutional and tortious conduct by allowing its internal systems, supervisory authority, and workplace culture to become tools of surveillance, intimidation, retaliation, and coercive control. The Statement of Facts alleges that between 2015 and 2026 NFCU employees accessed Plaintiff's accounts and workplace information without a legitimate business purpose; that Nolan Ciampini used his NFCU position and relationships to facilitate monitoring; that workplace employees with connections to the Ciampini defendants knew or discussed Plaintiff's personal life; and that Plaintiff's supervisor confirmed in March 2025 that numerous individuals had accessed Plaintiff's accounts without authorization or a legitimate business purpose.



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

After Plaintiff reported domestic abuse, stalking concerns, and unauthorized account access, NFCU allegedly failed to secure Plaintiff's private financial information, failed to prevent further misuse of its systems, failed to provide meaningful protection, and placed Plaintiff under supervision and workplace conditions that she experienced as intimidating given her known history of abuse and custody litigation. Plaintiff alleges that NFCU's actions and omissions enabled continued monitoring of her home life, finances, work availability, location, and legal-safety planning and interfered with her employment stability, privacy, safety, and ability to seek redress.

NFCU's alleged conduct was negligent, reckless, intentional, and outrageous because NFCU had actual or constructive notice that Plaintiff was a domestic-violence victim reporting unauthorized access and stalking, yet allegedly permitted employee access, institutional authority, and workplace relationships to be used in a manner that exposed Plaintiff to additional danger, humiliation, retaliation, and severe emotional distress. As a direct and proximate result, Plaintiff suffered loss of privacy and financial confidentiality, fear, workplace impairment, economic harm, worsening trauma symptoms, and disability beginning April 14, 2026.

**B. *Tort Liability—Governing Principles***

**a. Federal Common-Law Tort Liability**

When a private entity acts jointly with federal agents, federal common-law tort principles apply. *Farmer v. Carpenters*, recognizes intentional infliction of emotional distress (IIED) as a valid tort claim even when federal actors are involved. *Farmer v. Carpenters*, 430 U.S. 290 (1977). *Hustler Magazine, Inc. v. Falwell*, establishes federal standards for IIED and constitutional tort intersections. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). *English v. General Electric Co.* confirms that state-law tort claims may proceed unless displaced by federal statutory schemes. *English v. General Electric Co.*, 496 U.S. 72 (1990).



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

**b. Oregon Tort Law**

Oregon recognizes claims for Strict Liability; Negligence; Negligent Infliction of Emotional Distress (NIED); Intentional Infliction of Emotional Distress (IIED); Invasion of Privacy; Wrongful Disclosure of Confidential Information.

Oregon IIED elements apply in federal cases under the Erie Doctrine, requiring (1) Intent or knowledge that severe distress is substantially certain; (2) Conduct that is extraordinary or outrageous in the extreme; and (3) Severe emotional distress.

**i. Strict Liability**

A Strick liability claim requires the plaintiff to show only (1) the product was defective and (2) that the defect was the proximately caused the injury, there is no requirement to prove that the product was unreasonably dangerous. Cronin v. J.B.E. Olson Corp., 8 Cal. 3d 121 (Cal. 1972).

Here, the NFCU internal systems were utilized by NFCU employees to access personal identification information of the plaintiff without a legitimate business purpose which caused the disclosure of the illegally accessed information about the plaintiff to the defendant Jordan Ciampini causing him to gain knowledge which facilitated 10 years of abhorrently deplorable tragically traumatizing economic, physical, mental, emotional, and sexual abuse to the plaintiff, resulting in the plaintiff experiencing severe pain and suffering and extreme emotional distress for sixteen years, from which she will never fully recover due to the nature of the injury, experiencing triggering events numerous times daily often resulting in severe emotional distress, flashbacks, intrusive thoughts, insomnia, nightmares, reduced appetite, major depressive disorder, exponentially increased anxiety, and the inability to complete to her daily functions as a financial analyst with NFCU (a position she loved dearly).

**ii. Negligence**



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

A negligence claim depends on three variables: (1) the probability that injury would result from the actor's conduct, (2) the gravity of harm that could be expected to result should injury occur, (3) the burden of adequate precautions to avoid or minimize injury.

Here, it is probable that injury will result when Personal Identifiable Information (PII) is accessed through a financial institution's internal systems without a legitimate business purpose, resulting in disclosure of an individual's personal information, to which that individual is entitled privacy. The substantial gravity of unauthorized access to PII could be expected to result in the disclosure of the PII to other unauthorized individuals. The minimal burden of implementing safeguards and restrictions, is typically very minimal only requiring a meeting with or an email to the vendor providing the servicing of the software to "turn-on" additional features with the internal system.

NFCU's negligent handling of member Personal Identifiable Information (PII) by not implementing adequate restrictions on the access of employee PII was the direct cause the plaintiff's injuries, by other NFCU employees accessing her PII, disclosing her information to others without authorization, and thereby facilitating over 10 years of domestic and economic abuse against the plaintiff by defendant Jordan Ciampini.

**Defendant Conduct—NFCU's Tortious Conduct**

NFCU further engaged in tortious conduct by failing to follow reasonable financial-institution privacy, confidentiality, member-protection, employee-safety, and anti-retaliation practices prior to and after receiving notice that Plaintiff's financial accounts and workplace information had allegedly been accessed without authorization. NFCU's failure to impose reasonable restrictions on their internal systems to prevent employees from accessing the accounts of other employees without a legitimate business purpose, and NFCU's failure to investigate, stop, remediate, warn, or protect against further misuse foreseeably caused Plaintiff emotional distress,



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

loss of privacy, fear, humiliation, economic injury, and disability, and allegedly allowed private financial and employment information to be used to facilitate domestic-violence stalking, custody retaliation, and continued coercive control.

It is reasonably foreseeable that when over 12,000 employees work for the same financial institution in one small southern town that employees will access the accounts of other employees without a legitimate business need, even if it is unintentional, and that a reasonable person would expect the financial institution to implement safeguards and restrictions within the internal systems utilized by their employees to prevent the unauthorized access of Personal Identifiable Information (PII) of their own employees by other employees.

**1. Damages**

As a direct and proximate result of NFCU's constitutional and tortious conduct, Plaintiff suffered: Loss of privacy and financial confidentiality; Emotional distress, humiliation, and fear; Economic losses; Harm to liberty and security; Other damages according to proof.

Plaintiff seeks compensatory damages, punitive damages where permitted, attorney fees under § 1988 (for constitutional claims), and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

295.

WHEREFORE, Plaintiff Kimberly Laree Bell respectfully prays that this Court enter judgment in her favor and against Defendants Nolan Sebastian Ciampini; Jordan Alban Ciampini; Navy Federal Credit Union; and the United States of America, and award the following relief:

**A. Compensatory Damages**

Award Plaintiff compensatory damages in the amount of $36.9 million, or such other amount as the evidence at trial may establish, for physical injury, emotional distress, psychological



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

trauma, loss of earning capacity, loss of educational and professional opportunities, medical expenses, and all other injuries proximately caused by Defendants' conduct.

**B. Economic Damages**

Award Plaintiff damages for lost wages, lost employment opportunities, diminished earning capacity, costs associated with disability leave, and all other economic losses resulting from Defendants' actions.

**C. Non-Economic Damages**

Award Plaintiff damages for pain and suffering, emotional distress, humiliation, loss of dignity, loss of familial relationships, and other non-economic harms.

**D. Punitive Damages**

Award punitive damages against Defendants Jordan Ciampini, Nolan Ciampini, and Navy Federal Credit Union for their willful, malicious, reckless, and outrageous conduct, in an amount sufficient to punish and deter similar future misconduct.

**E. Constitutional Damages Under Bivens**

Award damages against the United States, through its federal officers acting under color of federal authority, for violations of Plaintiff's First and Fifth Amendment rights, including interference with her right to petition the government and deprivation of liberty without due process of law.

**F. Costs and Fees**



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850) 261-5183 |
bellkimberly850@gmail.com

Award Plaintiff her costs of suit, including filing fees, service costs, expert witness fees, and any other recoverable litigation expenses pursuant to 28 U.S.C. § 1920 and applicable federal law.

**G. Pre-Judgment and Post-Judgment Interest**

Award pre-judgment and post-judgment interest at the maximum rate permitted by law.

**H. Equitable and Injunctive Relief**

Issue appropriate injunctive or declaratory relief to prevent further harm to Plaintiff, including but not limited to:

- Orders prohibiting Defendants from engaging in further harassment, surveillance, retaliation, or interference with Plaintiff's employment or legal rights;
- Orders requiring Navy Federal Credit Union to implement safeguards preventing misuse of internal systems for surveillance or harassment.

**I. Any Other Relief**

Grant such other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable as a matter of right under the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

## VERIFICATION



**Kimberly Bell**
1732 Toucan Street NW, Salem, OR 97304 | (850)261-5183 |
bellkimberly850@gmail.com

I, Kimberly Laree Bell, declare under penalty of perjury under the laws of the United States of America that the foregoing Complaint is true and correct to the best of my knowledge, information, and belief.

Executed on this 4TH day of September, 2026, in Salem, Oregon.

Respectfully submitted,

______________________________

Kimberly Laree Bell
Plaintiff, *Pro se*
1732 Toucan Street NW
Salem, Oregon 97304
Bellkimberly850@gmail.com